UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---------------------------------x

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 1:26-sw-54 |
| Plaintiff, | |
| v. | |
| 313 SOUTH ROYAL STREET, | February 20, 2026 |
| Defendant. | |

---------------------------------x

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE WILLIAM B. PORTER,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

A P P E A R A N C E S

| | |
|---|---|
| FOR THE PLAINTIFF: | GORDON D. KROMBERG<br>United States Attorney's Office<br>2100 Jamieson Avenue<br>Alexandria, VA 22314 |
| | CHRISTIAN DIBBLEE<br>U.S. DEPARTMENT OF JUSTICE - Civil<br>1100 L. Street N.W.<br>Washington, DC 2005 |
| | JOSEPH E. BORSON<br>U.S. Department of Justice<br>20 Massachusetts Avenue N.W.<br>Washington, DC 20009 |
| FOR THE DEFENDANT:<br>(WP Company) | SIMON A. LATCOVICH<br>NICHOLAS GAMSE<br>Williams & Connolly LLP<br>680 Maine Avenue, S.W.<br>Washington, DC 20024 |
| (Client Rep) | JOHN KENNEDY, General Counsel |
| FOR THE INTERESTED PARTY:<br>(Hannah Natanson) | DOROTHY A. JEFFRESS<br>TRISHA ANDERSON<br>Hecker Fink LLP<br>1050 K Street NW, Suite 1040<br>Washington, DC 20001-3743 |

OFFICIAL U.S. COURT REPORTER: MS. TONIA M. HARRIS, RPR
United States District Court
401 Courthouse Square
Tenth Floor
Alexandria, VA 22314

**P R O C E E D I N G S**

(Court proceedings commenced at 2:00 p.m.)

THE COURTROOM CLERK: Calling 26-sw-54. United States versus 313 South Royal Street.

Parties, please state your name for the record.

MR. KROMBERG: Good morning, Your Honor. Gordon Kromberg for the United States. With me at counsel table is Christian Dibblee and Joseph Borson from the Federal Programs Branch civil division of the Department of Justice.

Mr. Dibblee will be primarily handling the proceeding today.

THE COURT: All right. Good afternoon.

MR. LATCOVICH: Good afternoon, Your Honor. Simon Latcovich from Williams and Connolly for movant, the Washington Post. With me are my partners, Nick Gamse, Tobin Romero, and Tom Hentoff. From the Washington Post General Counsel -- excuse me, with me is also the Washington Post general counsel, John Kennedy. With him from his office is James McLaughlin, Erin Gretsel (ph), and Micah Ratner. Also the publisher of the Washington Post, James [sic] D'Onofrio, and the executive editor, Matt Murray, are in attendance as well.

THE COURT: Welcome. All right. We're here today on movant's motion. Who is going to take the lead for the

movant?

MR. LATCOVICH: Right back up, Your Honor.

THE COURT: I've read everyone's materials. I appreciate them, they've been helpful in helping me prepare for today, and I'm ready to have you supplement anything you'd like.

MR. LATCOVICH: Thank you, Your Honor. May it please the Court. The government here seized the newsroom. Rather than focus on specific documents regarding the investigation at issue, the government commandeered the entirety of Washington Post reporter, Hannah Natanson's, professional life.

The seizure included information regarding 1200 confidential government sources from more than 120 federal agencies. Even worse, Your Honor, the government now seeks this Court's permission to run roughshod over the First Amendment in view of all the seized materials with not so much as a nod to the constitutional protections afforded the Press.

To clarify what's at stake today, I had plans to quote the Founders. I was going to wax, or at least try to wax eloquently about the First Amendment, but I woke up in the middle of the night last night with the simple thought that clarified the issue for me, and it's this: Today more than 1200 confidential government sources are following this very proceeding to learn whether or not their identities will be

exposed to government agents. That's the issue, that's why this is an unconstitutional prior restraint, Your Honor.

The government froze Ms. Natanson's news gathering. It took away her access to sources. And by threatening to review everything that it seized, the government has now chilled the Post sources and interfered with its publishing activities.

To limit these significant First Amendment interests, all of the seized materials should be immediately returned, or at the very least, Your Honor, the government should not be permitted to review these materials and any review should be done by counsel for the Post and Ms. Natanson.

Let's turn to the government's -- why the government's search and seizure is an impermissible prior restraint, Your Honor. The practical effect of the seizure has been to silence a reporter. Before the raid, Ms. Natanson was a reporter who covered the federal workplace and received dozens to hundreds of tips per day from confidential government sources on her Signal account.

Since the seizure, those sources have dried up. She cannot contact her 1200-plus sources because their contact information and communications were housed on Signal accounts that were only accessible through her seized devices. Now, nor can she publish the stories she was actively working on at

the time of the raid.

Furthermore, the government has chilled future news gathering and publishing activities. The government has no answer to the assertion that its seizure and extensive review will deter future sources from contacting the Post or Ms. Natanson. Instead, the government argues this is not a prior restraint at all because no court has actually ordered the Post or Ms. Natanson not to publish. But that formalistic argument, Your Honor, defies reality and is contrary to the law.

As the Supreme Court said in *Stanford Daily*, A seizure that interferes with the publication or communications of ideas is a prior restraint. That's the effect here. The government's argument would mean there's no prior restraint if the government seized all of the Post's printing presses. After all, under the government's theory, there will be no Court order preventing the Post from publishing a particular story the next day. That cannot be the law.

THE COURT: Let's just talk a little bit about the seizure. You've talked about the seizure and the scope of the seizure, the fact that her devices were taken, her phone, and her laptop, and the like.

In this electronic age that we live in, how would you propose that a search take place in a situation such as this when all the information is on an electronic device?

It's not like the *Stanford Daily* case where they go in and they look for a couple of photographs or it may be a more traditional search.

There are some nuances here, I think, with this case that we haven't seen in perhaps any other case that I've seen, where it involves both national security, and at least in the first instance a search of electronic data, which in today's age, oftentimes has to be gathered and sifted through.

MR. LATCOVICH: I agree, Your Honor. And I think I would respond by saying this, there are ways of actually doing document searches on site. It is -- it takes more time. It probably costs more in resources, but I think a special circumstance like this might justify it.

But even then, Your Honor, it's not -- you used the word "seizure" and you used the word "search." And I want to distinguish between the two. It's the combination of the broad seizure, plus the refusal to return unresponsive materials, plus the --

THE COURT: I get your argument on that, and that's something that I certainly appreciate, but we also are in a situation here where the government is in a standstill based on your filing and our decision to hold this hearing.

So I get your point, but I think the government hasn't returned it because they are -- have been ordered to hold their search and wait and see what happens today.

MR. LATCOVICH: Well, to be clear, Your Honor, we asked for that return before the standstill order and the government refused, but I agree --

THE COURT: I understand. But we have to appreciate the posture we're in.

MR. LATCOVICH: Right. And I do think, Your Honor, it's the combination of the overbroad seizure and the government's insistence that they be able to look at everything.

THE COURT: But back to my point, when we talk about a broad seizure, and we're talking about a seizure of the devices and the like, tell me how you would propose to do it in this day -- this electronic age with all the material residing on one laptop or two laptops or a laptop and some phones, as it is in this case?

You make much of the fact that it's been a broad search, and I get that. There may be something to your argument that some of it should be returned. But I just want to challenge the assumption that you're making that there were some other way to go about seizing the information and then searching for relevant information other than what happened. Other than your argument, I suspect, that you think it should have been handled by a subpoena, and we can take that as it comes.

MR. LATCOVICH: That's my first response is a

subpoena would, of course, be the easier way of doing this. But even --

THE COURT: But you recognize that the subpoena process is not always the right way to go. There are some agencies that may have existed here, it having to do with national security. And also, at least in my view as the judge who executed the search warrant, that there was some imminent concern that evidence would be destroyed.

Now, you've challenged that, and you think maybe that there was -- either it was too late or there would have been plenty of time, whatever the case may be, that's the judgment I made, and we're here today, and we're talking about it, but I still haven't heard some other way that you think this should have been handled, other than the subpoena.

MR. LATCOVICH: Well, Your Honor, I think the other way that it could be handled is, one, the seizure itself addresses those preservation concerns and those national security interests that you described, and period, full stop.

THE COURT: Once the information has been seized and preserved.

MR. LATCOVICH: Well, unfortunately, it's all of Ms. Natanson's materials --

THE COURT: I understand.

MR. LATCOVICH: -- that have been seized and preserved. I think to me, the question going forward then is,

how do we identify the material that might be responsive to the search warrant in a way that protects all the relevant equities.

THE COURT: I think that's a much more productive discussion.

MR. LATCOVICH: That is not a quibble with the seizure, it's how do we go forward from the seizure. And that's where, frankly, we hope to focus all of our arguments today, Your Honor.

THE COURT: All right.

MR. LATCOVICH: So, Your Honor, I take it then we don't need to focus on the prior restraint arguments right now?

THE COURT: I certainly understand the arguments.

MR. LATCOVICH: Okay. All right. Understood.

Then, Your Honor, let's turn to the 41(g), which is kind of my shorthand for how we think this thing should go forward.

So, if Your Honor is disinclined to order the immediate return of all of the materials, it should order the return of the nonresponsive materials.

THE COURT: Let me ask you this, are you aware of any instance where material has been returned in a -- I'll use the term "civilian" -- has been allowed to search the realm of information for national security information?

MR. LATCOVICH: Well, Your Honor, I mean, that can't be the standard for the First Amendment, because otherwise the Pentagon Papers case would have come out different. There the government sought to enjoin the Washington Post and the New York Times from publishing its articles, and its argument was you're going to publish classified information. And the Court said, No, the First Amendment trumps, that's a prior restraint.

So I understand the idea that classified information is important, protecting it is certainly a valid government interest, but it's not case determinative. Otherwise, the Pentagon Papers would have come out the other way.

THE COURT: All right. Any other example?

MR. LATCOVICH: Well, Your Honor, I've certainly had multiple criminal cases in which there has been classified information, and we have worked with the Department of Justice's Litigation Security Group to manage the defense counsel review of those classified information.

THE COURT: Sure, that happens all the time.

MR. LATCOVICH: Right. So, in that situation it's not directly -- it's not directly responsive to what you said, Your Honor, but there have been processes that I have been a part of where it is counsel for the aggrieved party that is reviewing classified information, yes.

THE COURT: All right.

MR. LATCOVICH: But the issue, Your Honor, is that here, at the very least, only counsel for the Post and Ms. Natanson should review the documents. And I think what's clear about this, Your Honor, as we've been discussing, I don't think there's any dispute, though, most of these -- a great majority of the information here is not actually responsive to the warrant.

And so, the question then is how to return, going to where you started, Your Honor, how to return these unresponsive materials. The touchstone for this is reasonableness. And as the Supreme Court has acknowledged, what's reasonable in one setting may not be reasonable in another setting. Just like Your Honor said, there are unique facts and circumstances here.

THE COURT: I agree with that.

MR. LATCOVICH: And so, I do think it is important to consider the background of reasonableness and the background settings here.

One, the government has abandoned decades of policy and practice in executing a search report -- a search warrant, rather, on a reporter's home in connection with a national security leak investigation. I mean, how different would the world have looked had the government executed a search warrant on the house of a young Bob Woodward or, go back to the Pentagon Papers, sought to execute a search warrant on the

Washington Post and the New York Times for the Pentagon Papers.

Also, consider the current environment, Your Honor. This is the same executive branch that's evicted from the Pentagon all reporters who would not agree to publish only what the government permitted them to do so. There is a pattern here, Your Honor, that this is part of.

But reasonableness also takes into account the particular facts here. I think going to what you said, if the government had been able to seize a particular file folder called "Perez-Lugones," certainly the balancing test would be very different, Your Honor, we would be making different arguments. But, they seized terabytes of data.

And, again, our focus is how do we move forward by protecting the First Amendment privileges that apply to that data, the PPA privileges that apply to that data, and the attorney-client privilege issues that apply to that data.

And the government's reaction, Your Honor, is -- well, I want to say this, the government has an issue of holding on to that property. They have an issue, Your Honor. In cases like the Supreme Court case in *Heller* and the *State v. J-R Distributors* case in Washington, all of those cases hold that the -- if the government lawfully seizes pornographic materials, it can't keep them, absent a prompt determination from the Court, that those materials were

obscene and, therefore, not protected by the First Amendment.

Here, we have a massive amount of data that's undisputed that's protected by the First Amendment, and yet, the government thinks that it can keep all of these. And it just can't be that pornographers have more protection than the Press under the First Amendment.

So the government's response here is don't worry about any of this, we've got a filter team. The filter team cures these issues. Your Honor, the rest of the world refers to a government filter team as the government. Those 1200 sources, doesn't matter whether its agents in the front of the courtroom or in the back of the courtroom who are looking at these communications, it's still the government. And regardless of whether you call them a filter team or something else, it's all the same government.

James Madison didn't include the filter team exception to the First Amendment and the Court has -- excuse me, the government has cited no precedent to adopt one now.

So, I think, Your Honor, the government does have interests. We acknowledge those. One is preservation of evidence, and two is classified information. I think the preservation of evidence, Your Honor, is easily accommodated by the government keeping -- I mean a freeze order, for example, accommodates that. Or even if the government -- if the Court orders the return of property under Rule 41(g), the

Court can condition that return of property on preservation of all of the documents, et cetera. So I think that is a --

THE COURT: What about just the return of the data versus the return of the devices? I mean it strikes me, and I don't want to get too far ahead of us, but it strikes me that there may be easy ways to look for information that clearly is irrelevant, whether it be date searches or some other way, and the data comes back versus the devices in the first instance.

The government cites some cases which, again, I think we're ahead of ourselves, that suggest that there may be something about devices and an inability to wipe information from it that may create some problem.

Now, those cases are not -- I should say technology changes rapidly, and we don't know what this situation may be. And, again, I think we're getting ahead of ourselves.

But just responding to your point about the return of the devices versus the return of the data, do you draw any distinction there?

MR. LATCOVICH: I think often in the case, Your Honor, the answer to that is "no." I think the data is data. I do think there is a unique circumstance here that makes a difference and that is the Signal account. I think absent access to the phone itself, that Signal data cannot be accessed.

But I also think these are details that could be

worked out as part of a process. I agree that perhaps I'm getting a little ahead of myself, but I think that is one big qualifier under the question about data versus devices.

And, again, that's not to say there might not be a way to accommodate that working with the DOJ's Litigation Security Group in a way that would allow us to pull even that data.

And, Your Honor, I want to talk, since you brought up classified information, I think one big red herring here is that the government thinks that we are trying to decide what's classified or not or asking you to do so, and that's just not correct. That is not --

THE COURT: It is certainly not a classification issue. If the government says it's classified, it's classified, and there's nothing the rest of us can do about it. I took their argument mostly to be maybe they are the best at determining what information is classified information and how it's located on the various devices.

MR. LATCOVICH: Yeah, certainly I think they have the expertise in classification, Your Honor. I don't think they have the expertise on locating the information on the devices, particularly given that these are Washington Post's devices and the devices belong to Ms. Natanson. I think, if anything, we have the expertise there and could more quickly find potentially responsive materials.

Again, Your Honor, I would say that the classification issues can be addressed by working with the DOJ's litigation support group. This is not an issue. I think the classification issue allows the government to dictate kind of the terms of the review and where that review takes place, but I don't think that it should be able -- it should be permitted to dictate the identity of the reviewers, given the privileged information that exists here.

So you've got those government interests, Your Honor. And I think in terms of balancing those interests, we're not riding on -- we're living in unprecedented times, but we're not riding on a blank slate here. We have the Fourth Circuit's case in the *In re Warrant Issued June 13th, 2019*, that specifically held that privileged determinations are a judicial function. Not to be held -- not to be made by a government filter team as they propose.

Again, I think the Fourth Circuit also reversed the finding that the filter team was appropriate. Again, what the government requested. We also see this in the *House Rayburn* [sic] case -- *Office Building* case as well, Your Honor. Again, to protect the constitutional privileges there, the D.C. Circuit rejected a filter team.

THE COURT: I recognize both of those cases, and I think that there is some daylight between those cases and this one only based on the information involved, right, because in

both of those cases, the review that was proposed to have been handled by the defendant in the *Rayburn House* case, or whatever it was, and the *Baltimore Law Firm* case had to do with privileged information that the attorneys and their clients had the right to access versus the government's position here that the movants have no right to look at classified national information -- classified defense information. It's a distinction, I think, is my point.

MR. LATCOVICH: I think there is -- I think you can try to draw a distinction there, Your Honor. I think it's a distinction without a difference. I think the government has created --

THE COURT: I think there's a difference between looking at your own material and looking at someone else's material, especially when that other material is National Defense Information that may bear a top secret classification. There's got to be a distinction there.

MR. LATCOVICH: Well, Your Honor, I think there is a distinction in the sense that you need a security clearance to review that information, of course, but that's a logistical burden, not a burden of impossibility, right. So I don't think -- what I don't think, Your Honor, is even if that is true for the limited number of documents that may exist as you describe, I don't think that justifies the government's intrusion into the massive number of other privileged

documents.

THE COURT: I don't disagree with that, and I think there's also a third option that's raised in *Baltimore Law Firm*, which is another way to go, which is that the Court does it.

MR. LATCOVICH: We agree, Your Honor. I mean, certainly I think a Court review is more protective than having government agents -- sorry, Christian, I'm pointing at you -- having government agents look at the documents. I do think -- we do think there is a slight chilling effect from the Court looking at this. I think confidential government sources probably still think of the Court as part of the government itself, and Ms. Natanson even had Court sources amongst her many, many government sources.

But we recognize that it is a spectrum, and I do think that that is a different analysis were the Court to look at these as opposed to government agents.

Your Honor, I guess the last thing I would say then is that we do feel pretty strongly this case is, as you say, there are very unique circumstances here. It's not about one reporter or one newsroom, it's about the confidential government sources here. And those confidential government sources have produced some of the most consequential investigative journalism cases in our country's history from Watergate to the Pentagon Papers.

And if the government and its agents can review a reporter's entire professional career on the basis of seeking information about a single individual, it's going to burn a thousand sources and censor their untold stories. And it's going to chill disclosures going forward and lead to self censorship of both confidential sources and reporters alike.

Your Honor, that's why we would respectfully request that the Court either return all of the information or ensure the return of nonresponsive material in a process supervised by the Court.

THE COURT: Thank you, Mr. Latcovich.

MR. LATCOVICH: Thank you, Your Honor.

THE COURT: Mr. Dibblee.

MR. LATCOVICH: Well, Your Honor, before -- I think counsel for Ms. Natanson, who is here, Ms. Jeffress, I think, has a few things to say as well.

MS. JEFFRESS: Thank you. Thank you, Your Honor. Amy Jeffress on behalf of Ms. Natanson, and I am with Trisha Anderson, my partner.

Your Honor, the government obtained a search warrant in this case in connection with its prosecution of Mr. Perez-Lugones. But the government's search and the seizures and proposed review of her personal and professional devices violates the privacy of my client, Hannah Natanson, who has suffered significant harm both personally and

professionally as a result of the government's actions.

So just briefly, it's 6 o'clock in the morning, a team of FBI agents came to her door with the warrant, forbid her from moving freely within her own home, and seized personal property in addition to Washington Post's property, including her iPhone with thousands of personal photographs, her running watch, her charger, items that really have nothing legitimately to do with the prosecution of Mr. Perez-Lugones.

In the shock of this unprecedented search, it's had lasting consequences. Most seriously, she's been unable to continue with her reporting. Because of the loss of her Signal, she has gone from receiving hundreds of messages a day to almost none.

As far as we are aware, Your Honor, the government has never before searched the home of a reporter based solely on the reporter's news gathering activities. And I think Mr. Latcovich's example of the Bob Woodward example is a good one.

THE COURT: Much has been made of that, I recognize that, but I want to just point out two things. One is that in the article she wrote about a process, she talked about the fact that she worked from home. And the other piece is they found the material relating to the search warrant at her home.

So I think that it's an inflammatory fact. I certainly get that a search warrant directed at anyone at any

time, no matter where they are, is probably a difficult time, but it just happened to be the case that she worked from home and her material was there.

MS. JEFFRESS: That is correct, Your Honor. But I think a lot of people work from home now in our post-Covid world, and I don't think this situation is really that much different, Your Honor, from a lot of leak cases that the government could be investigating.

I do want to talk a bit about my prior service at the Department of Justice. The Department of Justice has had a long-standing practice of avoiding just this kind of activity, not searching a reporter's home, but exhausting all other avenues to obtain information relevant to a national security prosecution.

And there have been hundreds of leak cases in the national security division's history, and in none of those did the Department decide to search a reporter's home, even though I'm sure there are other cases where there was probable cause to believe that a reporter's devices possessed at home might contain national security information.

So they've done something here that opens the door to a lot of reporters' homes being searched without a very good reason. I don't see much difference, and certainly the government can speak to this, but I don't see much difference between this case and many, many others that I've seen in my

experience.

But just to go back to the reasons for the long-standing practice, under which the Department of Justice did not search reporters' homes, is that the Department of Justice has recognized that they need to respect the free press and to have a careful balance of First Amendment and national security interests.

And so, throughout my tenure at the Department of Justice, the government was committed to the reasonableness of the First Amendment and to reasonably accommodating First Amendment interests in its handling of leak cases.

So, Your Honor, you were asking earlier for examples of situations where there has been a review of devices that have been seized by civilians, and there -- it's hard to come up with circumstances similar to this case because this has never been done before. And so, I understand why you're asking those questions. I just think it's difficult for us to come up --

THE COURT: It's also difficult, at least, on changing technology. And I'm not aware, at least, maybe you are, but I'm not aware of another case where the alleged method of communication of this material happened over a piece of technology, an application that was designed to almost immediately destroy the evidence. That's a relevant fact.

MS. JEFFRESS: I do appreciate that, Your Honor, but

it happens all the time. And that is -- it is a fact, it is a fact of modern technology, but I think Signal has been used now for, I don't know exactly how many years, but nine, ten years perhaps, and that -- this is still an unprecedented move on the Justice Department's part to try to obtain Signal.

I will also say that as we -- Your Honor, you were asking what are the alternatives for getting the government the information it needs. The situation that we have now is that while there was a subpoena to the Washington Post, that the Washington Post would reasonably process in order to provide the information that the government seeks. That subpoena's return date was at the end of last month and that has now past because of this litigation, because the government chose to issue a subpoena and also to search Ms. Natanson's home and prompt this litigation.

It's in the government's papers that Ms. Natanson's phone, iPhone was on lockdown, and so that iPhone is on lockdown, whatever disappearing messages are not going to be accessible given that fact, perhaps never. And so, I'm not sure that they are in a better position having done this search than they would have been if they had relied on the Post to provide the information they sought via subpoena.

Just to go back, Your Honor, to the questions that you were asking -- that you were asking Mr. Latcovich relating to the proposal of, you know, his and the Post reviewing the

information on the devices, I have been involved, both as a DOJ attorney and in private practice, in many cases in which defense counsel and even third-party counsel have been required to review and safeguard national security information.

I've had a clearance. In my 20 years at the Department of Justice, I had a security clearance. I've had it since 1994. I have had it reactivated in private practice. And so, I've had it for a very long time unbroken. And in any private practice, I have had access to national security information, including Top Secret/SCI and very highly compartmented information, which is not even at issue in this case.

But in my prior experience as defense counsel, I have worked very closely with the Department of Justice, with FBI agents, with the Litigation Security Group, to facilitate the government's legitimate need and access to classified information that my clients have in certain situations had access to.

To echo the point that Mr. Latcovich made about the DOJ Litigation Security Group, they are very responsible and have significant experience working with attorneys, with agents, with defense counsel, with the Court, to facilitate the secure handling of national security information.

So based on my experience, I believe that they would

be more than capable of assisting the Court and our team and the government in the review that would be required to meet the government's legitimate needs in this case.

So for all of those reasons, we would request that the devices be returned to the Post and to Ms. Natanson so that we, along with Post counsel, working with the government counsel, can provide them with the information, legitimately sought, for the purposes of the Perez-Lugones matter without compromising the Post and Ms. Natanson's reporting or the Nation's need for robust First Amendment.

And, Your Honor, I do fear that if that doesn't happen in this case that the government will, following its change to the media guidelines policy, perhaps start searching reporters' homes on a regular basis in leak cases. It's always been the case, in investigating leak cases, that the easiest way to get access to the information about who is leaking information to the news media, is to go to the news media and request that information or search for it.

But the government has been very cautious, in deference to the First Amendment in the past, to go first to the group of government employees who are the ones who had legitimate access to classified information. And the government would go and try to find everyone who had access to the information and figure out who it was who leaked that information. And to their credit, that's exactly what they

did in this case.

They found some classified information in reporting, they figured out who had access to it, they focused very quickly on Mr. Perez-Lugones, and they arrested him and they -- they did that before ever searching Ms. Natanson's home. And then, without access to any of the information from Ms. Natanson's home, they have now obtained an indictment.

I'm not sure what basis, and one can speak to this perhaps, I'm not sure what basis they have to obtain additional information from Ms. Natanson's home in connection with that prosecution.

But I do understand, having been in their shoes, that they would want to know everything that they can get their hands on that Mr. Perez-Lugones would have had. And if some of that is in the Post's devices and Ms. Natanson's devices, there are other ways of obtaining that than executing a search warrant at her personal home.

Thank you, Your Honor.

THE COURT: Thank you, Ms. Jeffress.

MR. DIBBLEE: Good afternoon, Judge Porter. As mentioned earlier, Christian Dibblee on behalf of the United States of America.

I woke up in the middle of the night too last night with a very bad voice, so I apologize already for how I sound. I'm just going to get through it as best we can.

THE COURT: No brilliant thoughts though?

MR. DIBBLEE: Not at that hour, Your Honor. I don't have Mr. Latcovich's clairvoyance in the early morning hours.

Your Honor, movants here seek return of property now even though the government has probable cause to believe that property contains evidence of a serious crime. Namely, the transmission of classified information to someone who was unauthorized to access it. And we can seek that all before the government has been able to review the property for that evidence.

As we say in our brief, the Courts around the country, and even the advisory committee's notes to Rule 41, acknowledge that this kind of motion should be denied when the United States has a need for seized property in an investigation of prosecution. And, I think it's --

THE COURT: Well, what's the government's need for all of the information? You must concede here that the scope of information that the government is likely to find, if it is allowed to search through this material, is going to be infinitesimally small compared to the amount of data that was taken.

MR. DIBBLEE: I'm happy to concede, Judge, that there is more information that has been seized than is responsive to the warrant. I would say, though, that is precisely why we had put in place the filter team to ensure

that only information that is responsive to the warrant gets to investigators. That is a common practice.

I understand what the movants say about filter teams, and I understand Mr. Latcovich's point that they are still made up of government agents. But it is nonetheless common and frequent for the government to engage in filter teams to ensure that investigators do not have access to privileged information or information that is otherwise protected.

I also would say, Judge, in multiple cases that we cite in our briefs, the Fourth Circuit has acknowledged that when the government is doing a search of a computer, information that is related to the criminal wrongdoing, it's not always labeled as such. And the government --

THE COURT: Certainly the case, right. I mean, the child porn cases are the typical ones that we see all the time where a defendant, as it would be in usually those types of cases, has misnamed or changed the name to make it hard to find. I would like to think that there are still search parameters that could be done that could figure out -- in this case in particular, because, you know, in say, like, a child pornography case, you're looking for a certain type of information.

In this case, the government is only authorized, at best, to look for information within a very narrow window of

time. And notwithstanding that, Ms. Natanson has been deprived of basically her life's work.

MR. DIBBLEE: So I have a couple of responses if you will allow. The first of which is the filter protocol that we have outlined in our brief does talk about using key words to ensure that filter agents who would be investigating or, excuse me, would be looking at these materials, would be doing their very level best to identify only information that is responsive to the warrant.

THE COURT: I will tell you that the protocol that you outlined in your brief I find to be exceptionally vague.

MR. DIBBLEE: I understand that, Judge. I'd be happy to tell you that we are willing to file the full protocol under seal after this hearing, if you would like. We did not do so for a variety of sort of administrative bureaucratic reasons that were occasioned by the rushed nature of this proceeding in getting ducks in a row.

THE COURT: Did I give you extra time?

MR. DIBBLEE: You certainly did, Judge. As I hope you can understand, there are several people above me in the chain and that kind of thing and, you know, we need to get the appropriate sign-offs. But we have those now, and we're happy to submit the filter protocol in its entirety to you on the docket under seal, if that's something that you would appreciate seeing, if that would help.

I can't remember where I was. I think you had -- you had mentioned about the government's need to look at -- or that there was more information that the government has seized than it has an interest in. You know, I do think that the filter team is designed to ensure that investigating agents do not receive more than they are -- than they absolutely need to deal with the crime that the government has probable cause to believe evidence of is on that computer.

THE COURT: Well, I mean just if you look at the *Baltimore Law Firm* case, right, and I think that that is probably the -- at least, as far as I understand, the top case in the country that relates to filter teams in this type of a scenario. And I think it's not unfair to say that the Fourth Circuit has been probably the most skeptical of all the other circuits of how to use the filter teams.

And one of the things that they raise in the *Baltimore Law Firm* case is, among a number of other things, including the scope of the information gathered versus what they are likely to obtain, but also the faith in the process.

And the movants make a decent point about the faith in the process here when it's beyond dispute that the government has been looking for leaks for a long period of time, and they go after a reporter in a unique way, in a way that they really haven't done before. It's not that crazy to think that public confidence might be lost if the government

gets to look at the same information that is protected.

MR. DIBBLEE: Well, I would say in response that the Fourth Circuit case also raises some facts that we talk about in our brief that I think very seriously undermine the public confidence there. Namely, the same U.S. Attorney's Office that had seized the evidence and had the filter team, was investigating other clients of that law firm. Meaning, I think in that circumstance --

THE COURT: Well, that could potentially be the case here. Now, maybe your protocol would be different, but it's not inconceivable to believe that if the filter team is looking through this material and the plain view doctrine is in place, that some of the attorneys who are looking at this material also find evidence of other types of crime, and then they believe that they are -- they may become involved in that as well.

MR. DIBBLEE: Your Honor, that is true, and plain view exception, under Fourth Circuit law, would allow the government to at least seek another warrant for material that is -- that is viewed during the course of that review.

THE COURT: Is the government willing to waive the plain view doctrine in this case?

MR. DIBBLEE: Your Honor, I'm sorry, I'm not authorized to do that right now, so no. But I will just point out that, as I said -- and, again, we are happy to submit the

full protocol in its entirety to you, and it sounds like maybe we should do that regardless.

The government -- the filter protocol intends to ensure that the government really is trying to keep this review hued, as narrow as possible, to attach it to the warrant that you signed.

I think the government understands and takes seriously that you did not authorize a fishing expedition, notwithstanding, the Fourth Circuit precedent that is out there that does allow for at least a cursory review of every file on the computer. The government does take that seriously.

THE COURT: While we're talking about taking things seriously, let me just, if I could, detour for just a moment and talk about the Privacy Protection Act.

MR. DIBBLEE: Sure.

THE COURT: Why was that not included in the application?

MR. DIBBLEE: Your Honor --

THE COURT: Did you not know about it or did you decide not to tell me?

MR. DIBBLEE: Your Honor, with respect, I was not involved in the search --

THE COURT: You're at the podium.

MR. DIBBLEE: And I understand that, but I do -- I

do not know the answer to your question.

THE COURT: Well, as I read your regulations in the Department of Justice manual, as well as in the regulations, approval for this warrant had to go all the way up to the Attorney General. That strikes me to believe that countless, maybe not countless, but a number of lawyers had the opportunity to look at that affidavit before it was submitted to me.

I also rejected it a number of times, and I had multiple conversations with counsel for the government over the course of two days about this warrant because I was concerned about it, and not one time did anyone from the government raise the issue.

Did you do it because you didn't know or you just decided not to tell me?

MR. DIBBLEE: Your Honor, I would --

THE COURT: What is the government's response?

(Mr. Kromberg stands.)

THE COURT: Sit down.

MR. DIBBLEE: Your Honor, the government's response is that the PPA is not adverse authority in this case for all the reasons that we --

THE COURT: Not adverse authority? Do you think it is relevant authority?

MR. DIBBLEE: So I do think it is relevant, but I

also, again --

THE COURT: Do you think you have an obligation -- do you think the government has an obligation to disclose relevant authority to a magistrate judge who is making the determination of probable cause on a search warrant?

MR. DIBBLEE: Your Honor, again, respectfully and with pleading some forgiveness on your part, I am not involved in how search warrants get done or get submitted --

THE COURT: Well, I would have liked to have thought that the government would have sent someone to the podium to discuss that issue.

MR. DIBBLEE: I certainly understand your frustration, Judge Porter.

THE COURT: That's minimizing it.

MR. DIBBLEE: Well, forgive me. I do not intend to minimize it. I think what I -- what we have said, though, and what I -- you know, I continue to say is that the PPA is, obviously, a statute that the government does -- is aware of.

THE COURT: The Department of Justice regulations require you to get approval. The regulations say that you have to file the PPA Act. They're all embedded in one another. How could you miss it? How could you think it doesn't apply?

MR. DIBBLEE: Excuse me, Your Honor. You mean it doesn't apply to this particular --

THE COURT: Yes.

MR. DIBBLEE: -- particular search? We have said in our papers why the PPA did not bar this particular search.

THE COURT: That's a different question. It very well may be that you're right. It very well may be that if you had identified it and I had reviewed it, I would have come to the same conclusion.

My question is, why didn't you raise it? You don't think you have an obligation to do that?

MR. DIBBLEE: Your Honor, forgive me. I'm not qualified to say whether the Department has an obligation or not.

THE COURT: Well, that is convenient.

MR. DIBBLEE: If I was qualified, I certainly would answer your question.

THE COURT: It's convenient that you're here not qualified to answer a, what I think, is a threshold question in this case. Go ahead, continue with your argument.

MR. DIBBLEE: Forgive me. I forget where I left off on this. I think we were talking about the Fourth Circuit case in the --

THE COURT: Tell me whatever you want me to know.

MR. DIBBLEE: Well, I think the key thing that I just -- that I do want to note is what we say in our brief, which is that the filter team in that case did involve certain

facts that are not present here. There are -- you've already raised the presence of classified information as being an important, I believe you said, daylight between that case and this case, and that is one reason why we think a filter team is extremely important, and that it's important that the government be the one, through its filter agents, to identify and locate the classified information, which is the government's property, and is information in which the government has a constitutional and a unique interest in.

I would also like to address something that comes up in the movant's reply brief and came up here during Ms. Jeffress's presentation, which is that -- this discussion about how the movant's counsel should be the ones to do a first review because they have security clearances that are relevant to this information that -- I believe they say they have TS/SCI clearances.

With respect to their former service, it is not just a clearance that allows someone to access classified information. What is required is not just a clearance, you have to sign an NDA. You also need to have a need-to-know the information. And a need-to-know is defined by the relevant executive order as a determination made within the executive branch that the prospective recipient must have access to that information.

And as we have -- as we say in our papers, and as

multiple courts have said over time, just because there are civil counsel are involved in the case that might raise classified information, does not mean that they then have a need-to-know all classified information that is the subject of that case. And this is -- this is part of *Sterling v. Tenet*, 416 F.3d 338, from the Fourth Circuit. *Tilden v. Tenet*, 140 F.Supp.2d 623, out of this district in 2000.

There have also been multiple statements by the Fourth Circuit and the D.C. Circuit, which have made clear that just because a lawyer is particularly trustworthy or is viewed as possibly being trustworthy, that does not mean that the risk of disclosure of national security information is not also -- is not still present.

I'm happy to give you those. The main case from the D.C. Circuit is *Ellsburg v. Mitchell*, 709 F.2d 51, from 1983. And then the Fourth Circuit case on this is a case called *Alfred A Knopf, Inc. v. Colby*, 509 F.2d 1362, Fourth Circuit 1975.

So, again, I'm not trying to be disrespectful of the prior service of opposing counsel or of their trustworthiness. But courts before this one have acknowledged that when classified information is -- excuse me, that disclosure of classified information to even one person without a need-to-know does create a risk of disclosure. It could be inadvertent, even in a good faith effort, it would be done by

movant's counsel to review -- to review the information, that risk is still there. And for that reason, we don't think that they should be the ones to take a first crack at that review.

THE COURT: All right.

MR. DIBBLEE: If you don't mind if I check my notes real quick.

THE COURT: Yes.

MR. DIBBLEE: All right. I have nothing further for Your Honor.

THE COURT: All right. Mr. Kromberg, did you want to be heard? You can come to the podium if you would. I didn't mean to be intemperate with you, but you might sense that I'm a little frustrated by --

MR. KROMBERG: Yes, sir.

THE COURT: -- how our process went down.

MR. KROMBERG: Yes, sir. As Your Honor knows, I was the AUSA who was on that warrant.

THE COURT: Did you not tell me intentionally or did you not know?

MR. KROMBERG: I knew.

THE COURT: Why didn't you tell me?

MR. KROMBERG: Because I had been involved in multiple search warrants just like this in the past -- I shouldn't say just like this. But, in the *WikiLeaks* case, we got multiple search warrants and we had multiple memos from

the Department of Justice discussing the PPA, and we were advised between 2013 and 2020 that the PPA did not apply when there was a reason to believe that the individual who maintained the information was involved in the offense.

And in this case, paragraph --

THE COURT: Isn't that an issue for the Court to analyze and at least know about so it can consider it in evaluating a search warrant or do you think it's best to leave it out?

MR. KROMBERG: First --

THE COURT: I mean, doesn't that get you closer to the conclusion you're looking for?

MR. KROMBERG: Yes. However, Judge, I would note that not only that, but the PPA memos that we've done in the past, say that instrumentality --

THE COURT: I'm not so interested in those.

Do you disagree with me that it's relevant information to the inquiry?

MR. KROMBERG: Yes, I disagree --

THE COURT: That's the end of the inquiry?

MR. KROMBERG: May I finish, please? I don't think it's appropriate for us to discuss what laws don't apply under certain facts.

THE COURT: I find it hard to believe that in any way that this law did not apply.

MR. KROMBERG: Then I apologize to you, because I should have told you that if -- but, again, I do not think that we put in the laws that don't apply when we search for warrants.

THE COURT: I just -- I just can't understand how you could have reached that conclusion when the policy manual, the regulations, and the statute themselves speak to these types of issues. I just --

MR. KROMBERG: They do. And the Department of Justice had said that they don't apply in this particular setting, and I have the memos on that from a case when we searched for the email, excuse me, for the computer --

THE COURT: How about something from a Court that said they don't apply versus something from the Department of Justice as the outcome --

MR. KROMBERG: In fact, Judge Ellis, Judge, Judge Ellis wrote, when he -- when a woman, who was a photojournalist, sued because she was being searched in *Sennett v. United States*, Judge Ellis ruled that it didn't apply. And the search warrant was -- did not say -- the affidavit in support of the search warrant did not say that the PPA doesn't apply, it didn't say anything about the PPA. And when Senate sued, Judge Ellis ruled that the facts in the search warrant was sufficient to show probable cause that the suspect exception applied and, therefore, the suit was

dismissed.

THE COURT: All right.

MR. KROMBERG: And that case was -- was affirmed in the Fourth Circuit, and in the Fourth Circuit the Fourth Circuit repeatedly cited the case, I believe from the Sixth Circuit, which said that in these circumstances the filter team is the way that you make sure --

THE COURT: I'm not looking for additional argument on that. My question was very simple to you, and I understand your response. Thank you.

MR. KROMBERG: Thank you.

MR. LATCOVICH: Your Honor, may I very briefly?

THE COURT: Yes, please.

MR. LATCOVICH: Your Honor, first, on the search protocol, we've been shooting at a moving target from the day of this raid. Every time we talk to a government agent, it is, well, these are decisions being made above me. We got no clarity. In fact, before we filed, sought this Court's intervention, we got no clarity whatsoever on a review protocol. They refused to commit to any protocol.

We see one in the papers that we don't quite understand other than it doesn't provide any protection for the First Amendment, and now we understand that there's apparently another protocol. I don't know what that is, so I'm not sure what else there is to say to that.

On the issue of filter teams, Your Honor, I think you made most of my arguments better than I could, so I'm not going to dwell on that. I will say this, to the extent there was a discussion about plain view, I think that was a driving force in the Fourth Circuit's opinion. And I do think it cuts against, given the privileged nature of the other documents here, I do think it cuts against the use of a filter team.

On access to classified information, Your Honor, I think the government provides clearances to counsel in cases all the time, and I don't think this case is any different. I think the idea, frankly, that an inadvertent disclosure is the best excuse they can have for not providing clearances in this case to somebody who's had a TS/SCI clearance like me, multiple members of our team have had TS/SCI clearances, both Ms. Natanson's counsels, sitting at counsel table, have had TS/SCI clearances. The idea that the best the government can muster is inadvertent disclosure, I think, tells a lot.

Finally, Your Honor, I was paying attention, and it sounds like the Court is inclined to do the review himself. And if so, my only request would be that counsel for the Washington Post and Ms. Natanson be able to review any potential responsive documents that you determine are potential responsive for privilege before they are turned over to the government.

I think that was the protocol in the *In re Search*

*Warrant* issued June 13, 2019, approved by the Fourth Circuit. That was the same process in the D.C. Circuit formulated in the *House Rayburn Building*. So we would just like the opportunity to assert privilege. Obviously, Your Honor would be the one who would ultimately decide those privileges.

THE COURT: All right.

MR. LATCOVICH: Thank you.

THE COURT: Thank you. Ms. Jeffress, did you wish to be heard again?

MS. JEFFRESS: Nothing further from us, Your Honor. Thank you.

THE COURT: All right. Well, thank you all for your arguments and your written papers.

I have a pretty good sense of what I'm going to do here, but I thought about giving you my decision today, but I want to think a little bit more about some of the things that I heard from you today and get something to you quickly.

I do think that we're going to need a follow-up get-together somewhat soon to start on the process, whatever it may be. I was going to propose Thursday.

Is counsel available?

MR. LATCOVICH: Yes, Your Honor.

THE COURT: All right.

MR. DIBBLEE: Your Honor, I apologize. I am arguing a case in Massachusetts on Thursday. I will not be back until

Friday around 11:00 a.m. I fly into Reagan, so I can come here after I land if you'd like.

THE COURT: No, I can't -- well, I'm sorry, you arrive when?

MR. DIBBLEE: Friday. I come back from Boston on Friday.

THE COURT: Oh, you come back. Not Thursday. Okay. I'm just trying to move this along, because I understand the issues here. I'm not available on Friday or Monday. If we push into the following week, I have to look at my calendar.

Tuesday morning? I'm sorry, that's the 3rd, March 3rd. I can do the morning, not the afternoon. 10:00 a.m.?

(Mr. Dibblee nods head.)

THE COURT: All right. We'll plan to get together on March 10th at 10:00 a.m. -- excuse me, March 3rd at 10:00 a.m. You should have something from me before then and I hope that we can --

MR. LATCOVICH: Your Honor, I believe I'm in the DDC in the morning on March 3rd. Is it possible to do the afternoon?

THE COURT: No, I can't do the afternoon. I have something scheduled already. I can do the afternoon on the 4th.

MR. LATCOVICH: Yes, Your Honor.

MR. DIBBLEE: Yes, Your Honor.

THE COURT: March 4th at 2:00 p.m. All right.

MR. GAMSE: I'm sorry, Your Honor, what time was that?

THE COURT: 2:00 p.m.

All right. Again, thank you all, and I look forward to seeing you March 4th.

**(Proceedings adjourned at 2:54 p.m.)**

CERTIFICATE OF REPORTER

I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Motion hearing in the case of the **UNITED STATES OF AMERICA versus 313 SOUTH ROYAL STREET**, Case No.: 1:26-sw-54, in said court on the 20th day of February, 2026.

I further certify that the foregoing 47 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my name, this February 22, 2026.

Tonia M. Harris
________________________________
Tonia M. Harris, RPR
Official Court Reporter