IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| IN THE MATTER OF THE SEARCH OF ) | 1:26-sw-00054 (WBP-AJT) |
| THE REAL PROPERTY AND PREMISES ) | |
| OF HANNAH NATANSON ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Government's Objections to the Magistrate Judge's Opinion and Order on the Motion for Return of Property, [Doc. No. 74] (the "Objections"), which Movants The Washington Post and Hannah Natanson (collectively "the Movants") oppose, [Doc. No. 81]. The Court held a hearing on the Objections on April 9, 2026, following which it took the Objections under advisement. For the reasons stated herein, the Objections are OVERRULED and the Magistrate Judge's decision to review the seized documents [Doc. No. 62] is AFFIRMED.

### I.    BACKGROUND

A. Hannah Natanson's Journalistic Work

Hannah Natanson ("Natanson") is an award-winning investigative journalist with the Washington Post, who covers "President Trump's reshaping of the federal government and its effects." [Doc. No. 9-1], Decl. of Hannah Natanson ¶¶ 2, 3. In the past year, Natanson has authored "more than 200 articles across twenty news desks" based on information received from over 1,200 confidential sources—federal employees from more than 120 agencies or subagencies who requested anonymity because they "fear retribution from the government due to their disclosures." *Id.* ¶¶ 5–6, 39.

1

B. <u>Arrest and Investigation of Aurelio Perez-Lugones</u>

On October 31, 2025, Natanson coauthored an article that was published in the Washington Post that the Government contends contained TOP SECRET//SCI//NOFORN"[1] classified information "from a Government Intelligence Report." [Doc. No. 74] at 2. After the Federal Bureau of Investigation ("FBI") investigated the unauthorized disclosure of the classified material, Aurelio Perez-Lugones ("Perez-Lugones"), a government contractor with a TOP SECRET security clearance, became a suspect. [Doc. No. 35-1], Decl. of Roman Rozhavsky ¶¶ 5, 7, 8. The FBI uncovered five instances of Perez-Lugones accessing classified information that then appeared in Washington Post articles authored or coauthored by Natanson. *Id.* ¶¶ 13, 15, 17, 22. On January 8, 2026, the Government arrested Perez-Lugones on a criminal complaint issued out of the District of Maryland, charging him with unlawfully retaining national defense information in violation of 18 U.S.C. § 793(e). [Doc. No.] 9-7.[2]

C. <u>Search Warrant of Natanson's Residence</u>

On January 12, 2026, as part of the Government's investigation of Perez-Lugones, an assistant United States attorney for the Eastern District of Virginia (the "AUSA") applied on an expedited basis for a search warrant to seize materials from Natanson, who lives in the Eastern District of Virginia. Initially, the Magistrate Judge who received the search warrant application rejected the Government's proposed search warrant due to "concern[s] about both the scope of the

---

[1] Documents containing classified information are marked with headers to indicate the classification of the information and any restrictions on it. Information is classified as "TOP SECRET" when its unauthorized disclosure "could reasonably be expected to cause exceptionally grave damage to the national security." 18 C.F.R. § 3a.11(a)(1). The "SCI" marking indicates that it relates to intelligence sources, methods, and analytical processes. The "NOFORN" marking indicates that information is not releasable to foreign nationals and can be disseminated only to U.S. nationals. *See* [Doc. No. 74] at 2 n.1.

[2] Perez-Lugones was subsequently indicted on charges of accessing and disclosing classified information, documents, and notes to Natanson. Indictment ¶¶ 1–2, *United States v. Perez-Lugones*, No. 26-cr-30 (D. Md. Jan. 22, 2026), Dkt. No. 25.

proposed search warrant and the government's apparent attempt to collect information about Ms. Natanson's confidential sources." [Doc. No. 62] at 4.

On January 13, 2026, the AUSA submitted another search warrant, which the Magistrate Judge also rejected, following which the Court held "multiple in-person and telephone conferences with the AUSA, who presented successive versions of the proposed warrant," [Doc. No. 62] at 4, until the Court ultimately approved a search warrant "limited to all records and information, including classified and/or national defense information, from the time period October 1, 2025, to the present, which constitute records received from or relating to Aurelio Luis Perez-Lugones, as evidence of violations of 18 U.S.C. § 793." [Doc. No. 4] at 4. The Court's probable cause finding rested principally on three allegations: (i) on multiple occasions, Perez-Lugones had provided Natanson with top secret and other classified information that appeared in her published articles days later; (ii) they had exchanged this classified information using Signal; and (iii) they had set their messages to auto-delete after one day. [Doc. No. 62] at 4–5.

On the morning of January 14, 2026, the FBI executed the search warrant at Natanson's home and seized two laptops, one mobile phone, a portable drive, a recording device, and an exercise watch. [Doc. No. 5] (collectively the "Seized Material"). At or around the same time, the Government issued a grand jury subpoena to the Washington Post requesting substantially the same information it sought with the search warrant served on Natanson. [Doc. No. 9-8]. That same day, counsel for the Washington Post contacted the Government, requesting that the Government refrain from reviewing any of the material on the grounds that the Seized Material contained materials protected by the First Amendment and the attorney-client privilege. [Doc. No. 9-4] at 2. After multiple rounds of meet-and-confers, the Government agreed to withhold an initial substantive review of the Seized Material until January 20, 2026, but ultimately rejected the

3

Washington Post's proposal to return the Seized Material to allow the Washington Post to conduct an initial review of responsive material to the grand jury subpoena. *Id.* at 2–3.

### D. Rule 41(g) Intervention

On January 21, 2026, Movants moved this Court to intervene and for return of property pursuant to Fed. R. Crim. P. 41(g),[3] requesting that all Seized Material be returned or, in the alternative, that the non-responsive materials be returned with judicial oversight of the return process. *See* [Doc. Nos. 8, 9]. The Government opposed the motion, arguing that a privilege review conducted by a Government "filter team" would adequately protect the privileged information.[4] [Doc. No. 35]. Movants also moved the Court for a standstill order to "preserve the status quo," [Doc. No. 10], which the Court granted with an order that the Government preserve and withhold review of the Seized Material pending Court authorization. [Doc. No. 18].

### E. Magistrate Judge Porter's Order

On February 24, 2026, Magistrate Judge Porter issued an order denying Movant's request for the return of all Seized Material but granting their alternative request for return of the non-responsive materials, with the Court, in first instance, conducting an independent judicial review of the Seized Material. [Doc. No. 62].[5] As a threshold matter, Judge Porter emphasized that the Government's failure to reference and analyze in its warrant application the applicability of the

---

[3] Fed. R. Crim. P. 41(g) allows "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to "move for the property's return . . . in the district where the property was seized."

[4] Under its proposed filter protocol, the Government would identify all information within the scope of the warrant and then "segregate information that is outside the warrant's scope, privileged, or otherwise protected, and would send all *other* information within the scope of the warrant to the prosecution team." [Doc. No. 74] at 27 (emphasis added). It therefore appears from this protocol that the Government does not object to the Court's returning unclassified, non-responsive material to Natanson following its review of the seized files. Nor does the Court construe Movants' position as objecting to the Government's retention of responsive classified material.

[5] Magistrate Judge Porter ordered the Court's standstill order to remain in effect and further directed the Government to file a supplemental brief addressing the chain of custody of the documents and other questions concerning the logistical aspects of reviewing the Seized Material. [Doc. No. 72]. The Government submitted that briefing on March 25, 2026. [Doc. No. 88].

Privacy Protection Act ("PPA"), 42 U.S.C. § 2000aa *et seq.*, "seriously undermined the Court's confidence in the government's disclosures in this proceeding," adding that if the Government had disclosed the PPA's applicability, the Court may have denied the warrant application entirely. [Doc. No. 62] at 9, 13. Judge Porter also found that "Movants' First Amendment rights have been restrained" through the Government's seizure of "all of Ms. Natanson's work product, documentary material, and devices." *Id.* at 21. Recognizing that Movants do not enjoy "absolute press immunity from legal constraints," Judge Porter reasoned that Movants' First Amendment rights must be balanced against the Government's compelling interests in its prosecution and protecting classified national security information, and therefore, the Court could not "simply order the government to return all devices and permit Movants to unilaterally identify material responsive to the search warrant." *Id.* at 18.

In balancing these interests, Judge Porter relied on the Fourth Circuit's decision in *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) ("*Baltimore Law Firm*") to conclude that the Court should conduct the responsiveness review of the Seized Material, which under the Government's own admission likely only contained a "small fraction" of material responsive to the government's interests. [Doc. No. 62] at 19. And given the "large swath of information unrelated to [the Government's] investigation" that contains privileged information protected by the First Amendment and attorney-client privilege, Judge Porter concluded that "the unique facts and circumstances of this case" precluded the Government's filter team from reviewing the fruits of this search warrant. *Id.* at 19–20.

F. Government's Objections to Magistrate Judge's Memorandum Opinion and Order

On March 10, 2026, the Government filed its Objections, asking the Court to overrule Judge Porter's Memorandum Opinion and Order to the extent that it ordered a judicial review of the Seized Material, arguing instead that the Government should be authorized to search the seized devices using a filter protocol. [Doc. No. 74]. The Government argues that the proposed judicial search of the Seized Material is inconsistent with the separation of powers, including the Executive's duty to protect classified material, and is unworkable; and conversely that the Government's seizure and proposed search of the materials is permitted by the Fourth and First Amendments to the Constitution, and is not barred by the PPA. *Id.* The Government further submits that the use of a filter team is the only appropriate course of action to balance the countervailing interests at issue. *Id.* Movants oppose the Objections and urge the Court to overrule them and affirm Judge Porter's decision to conduct a judicial review of the Seized Material. [Doc. No. 81].

## II.    STANDARD OF REVIEW

A district court reviews a magistrate judge's order under a *de novo* standard of review on "dispositive" matters and under a clearly erroneous or contrary to law standard of review on "nondispositive" matters. FED. R. CIV. P. 72(a), (b); *see also* FED. R. CRIM. P. 59(a), (b) (same). In its Objections, the Government contends that the Court should review "the magistrate judge's order *de novo* because the Rule 41(g) motion is 'dispositive of a claim or defense,' namely Ms. Natanson's claim that the Government should return her property." [Doc. No. 74] at 9.

A final decision by a magistrate judge to have property returned under Rule 41(g) would be subject to a *de novo* standard of review by a District Court because it would constitute a dispositive ruling on the merits of a claim for the return of property. *See United States v. Hiya*,

2025 WL 2416733, at *3 (S.D.N.Y. Aug. 21, 2025) (reviewing *de novo* a Rule 41(g) motion related to a search warrant); *United States v. Collins*, 2012 WL 3537814, at *6 (N.D. Cal. Mar. 16, 2012) (treating a Rule 41(g) motion as dispositive for purposes of magistrate-judge jurisdiction). Here, the Magistrate Judge granted Movants' Motion for Return of Property as to all information outside the limited scope of the search warrant and denied it with respect to the limited information authorized by the search warrant. [Doc. No. 62]. To determine what information is outside the scope of the search warrant, the Magistrate Judge will conduct an independent judicial review of the Seized Material. *Id.* Importantly, however, the Magistrate Judge has yet to conduct that review or issue a final decision implementing his decision under Rule 41(g).[6]

At this point, the Government's Objections go only to the method selected to determine which materials to return to Natanson—judicial review rather than a Government filter team. *How* and by *whom* the Seized Material is reviewed for responsiveness are different questions than *whether* any Seized Material should be returned at all. And while the former strikes the Court as non-dispositive questions, the Magistrate Judge's decision to return non-responsive documents after a judicial review has some aspects of finality to it and it is reasonably debatable whether a *de novo* standard would apply. In any event, for the reasons stated herein, the Court concludes that the Magistrate Judge's Order should be affirmed under either the more deferential "contrary to law or clearly erroneous" standard of review for non-dispositive motions or the more exacting *de novo* standard of review for dispositive motions. *See* FED. R. CIV. P. 72; FED. R. CRIM. P. 59.

---

[6] The Magistrate Judge ordered both the Government and Movants to submit additional briefing on the review process. *See* [Doc. No. 109].

### III.    DISCUSSION

In its Objections, the Government argues that the Magistrate Judge erred when he ordered a judicial review of the Seized Material. In assessing whether the Magistrate Judge correctly concluded that judicial review of the Seized Material is appropriate, the Court has considered the applicable constitutional rights and protections under the First and Fourth Amendments and the PPA, as well as the Executive's Article II authority and duty to prosecute wrongdoing and protect classified and sensitive information.

A search warrant for information or materials contained on computers or other electronic storage devices often results in the seizure of non-responsive information that nevertheless can be reviewed for responsiveness without invading applicable privileges and protections. Central to this dispute is whether the non-responsive materials—which Movants claim are privileged or protected and which, by all accounts, constitute the vast majority of the Seized Material—warrant judicial review of the materials seized. The Government contends that once it establishes probable cause to search for and seize evidence of a crime in compliance with the Fourth Amendment, as it did here, the Government, not the Court, is entitled to "review the seized devices for material responsive to the warrant," [Doc. No. 74] at 20, regardless of the protected or privileged nature of non-responsive documents swept up with the Seized Material, particularly in this case where the responsive documents include classified information. This is so, the Government contends, because (1) the Government's review of the Seized Material in its entirety is not precluded or limited based on a reporter's privilege under the First Amendment, the prior restraint doctrine under the First Amendment, or the PPA; and (2) unlike the "post-seizure judicial privilege review" in *Baltimore Law Firm*, relied on by Judge Porter, judicial review in this case, which involves classified information, would violate the separation of powers because it would impermissibly

8

enlist the Court as "a member, if not the leader of the search party," would compromise classified or national defense information, which lie outside the Court's expertise,[7] and would be logistically unworkable. *See* [Doc. Nos. 74, 94].

## A. The Seized Material is Likely Privileged and Protected by the First Amendment and Attorney-Client Privilege

The Government does not dispute that the Seized Material likely contains information about Natanson's confidential sources, information about her colleagues' sources, conversations with sources, notes, recordings, draft articles, and similar materials.[8] The Movants claim those materials enjoy protections under the First Amendment based on the reporter's privilege, the doctrine against prior restraint, as well as the PPA. The Government argues that the documents do not enjoy protections under either the First Amendment reporter's privilege or the doctrine against prior restraint, and that any protections afforded under the PPA do not require judicial review.[9]

The Government's expansive view of what is permissible under the Fourth Amendment entirely disregards Natanson's rights under the PPA and the First Amendment, which "entitle[s] news reporters to some constitutional protection of the confidentiality of their sources." *Ashcraft*

---

[7] The Government contends in this regard:

> Movants do not contest that Perez-Lugones obfuscated the classified nature of certain documents, such that classified material will not be easily identifiable. And there will likely be materials that do not appear responsive on their face except for the inclusion of classified material transferred by Perez-Lugones. For example, suppose Ms. Natanson emailed her editor regarding an unnamed source and included snippets of information that source shared. Because the source is unnamed, the Magistrate Judge will not be able to tell on the face of the document whether that email 'relates to' Perez-Lugones. And the Magistrate Judge would have difficulty recognizing the snippets as classified—only an original classification authority will be able to reliably assess classification within the scope of the warrant. Because the Magistrate Judge wishes to exclude those classification and subject matter experts from the search process, there is a significant risk that he will return classified information to Ms. Natanson.

[Doc. No. 94] at 5 (internal citations omitted).

[8] Movants contend, and the Government does not dispute, that the Seized Material also includes privileged attorney-client communications, as well as privileged communications between Natanson and her physician. [Doc. No. 81] at 13.

[9] The Movants do not appear to contend that judicial review is required solely by the presence of documents protected by the attorney-client privilege, but point to the presence of such documents as further reasons that justify judicial review.

*v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000) ("Such protection is necessary to ensure a free and vital press, without which an open and democratic society would be impossible to maintain."); *Rossignol v. Voorhaar*, 316 F.3d 516, 521 (4th Cir. 2003) (holding that Sheriff Department's "seizure" of a newspaper "clearly contravened the most elemental tenets of First Amendment law"); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025) ("[B]ad faith use of investigative techniques can abridge journalists' First Amendment rights."); *Roaden v. Kentucky*, 413 U.S. 496, 501–05 (1973) (the Fourth Amendment "must not be read in a vacuum" and should be considered against the protections of the First Amendment); *see also Marcus v. Search Warrants of Prop. at 104 E. Tenth St., Kansas City, Mo.*, 367 U.S. 717, 729 n.22 (1961) ("[W]here there is even a charge against one particular paper, to seize all, of every kind, is extravagant, unreasonable and inquisitorial. It is infamous in theory, and downright tyranny and despotism in practice.").

Although a reporter's privilege "is not absolute and will be overcome whenever society's need for the confidential information in question outweighs the intrusion on the reporter's First Amendment interests," the Fourth Circuit has instructed district courts to conduct the following three-part balancing test in weighing these interests and determining whether that reporter's privilege can be overcome under the Fourth and First Amendments: "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." *Ashcraft*, 218 F.3d at 287 (citation omitted).

The Government argues that the search warrant clearly authorized a search for documents and information "relevant" to its law enforcement duties, namely "classified and/or national defense" materials during a specified time period relating to Perez-Lugones, *see* [Doc. No. 4] at 4, and therefore, "the warrant impliedly authorized officers to open each file on the computer and

view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization[,]" even if that information exists among a large swath of information that is unresponsive to the search warrant. [Doc. No. 74] at 17 (citing *United States v. Williams*, 592 F.3d 511, 521 (4th Cir. 2010)). But here, the only documents "relevant" to the Government's efforts in investigating Perez-Lugones' alleged criminal conduct may be as few as a handful of documents, while the non-responsive "irrelevant" newsgathering materials constitute over one thousand documents; and there is no compelling interest in the Government's reviewing these irrelevant documents if there is an alternative means to identify relevant documents, namely, judicial review. Although it is conceivable that the Government, under certain circumstances and conditions, may be authorized to conduct a search of Seized Material that includes First Amendment or PPA protected documents, the Government has not cited, and the Court has not identified, any case with a seizure comparable in scope and content to the one in this case.[10]

The Government relies heavily on the Fourth Circuit's opinion in *United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013). In *Sterling*, the Fourth Circuit held that a reporter could not invoke his First Amendment privilege to resist a "legitimate, good faith subpoena" to testify about facts relevant to a criminal prosecution. Important for this case is that the Fourth Circuit in *Sterling* recognized that the subpoenaed testimony at issue went "to the heart of the prosecution" and there was no reason to believe that testimony would "implicate[] confidential source relationships without a legitimate need of law enforcement." *Id.* at 499. Here, Natanson, as a reporter, is not resisting testifying or providing relevant information, but rather is resisting the Government's

---

[10] None of the cases cited by the Government in its discussion of the warrant's propriety under the Fourth Amendment discuss or even reference the First Amendment. *See United States v. Williams*, 592 F.3d 511 (4th Cir. 2010); *United States v. Cobb*, 970 F.3d 319 (4th Cir. 2020); *United States v. Zelaya-Veliz*, 94 F.4th 321 (4th Cir.), *cert. denied*, 145 S. Ct. 571 (2024).

review of irrelevant material that goes far beyond the stated prosecutorial interest of investigating Perez-Lugones.

B. The Government's Seizure of Natanson's Work Product and the Prior Restraint Doctrine

The Government contends that the seizure does not constitute a prior restraint on speech because Natanson is not prohibited "'from engaging in any expressive activities in the future,' nor does she need to 'obtain prior approval for any expressive activities' she wishes to undertake." [Doc. No. 74] at 25 (citing *Alexander v. United States*, 509 U.S. 544, 550–51 (1993)).

The Government's seizure of the entirety of Natanson's work product, including her active stories, her notes on future investigations, and her background and confidential source material, fundamentally affects Natanson's ability to publish in the areas she was investigating and would appear to fall within the established contours of the prior restraint doctrine. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256 (1974) ("Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers."); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976) (prior restraints on expression is "the most serious and the least tolerable infringement on First Amendment right" and are viewed with a "heavy presumption against [their] constitutional validity") (citation omitted); *Rossignol*, 316 F.3d at 522 (physical seizure of newspapers "before the critical commentary ever reached the eyes of readers . . . met the classic definition of a prior restraint"); *Washington v. J-R Disiribs., Inc.*, 765 P.2d 281, 287-89 (Wash. 1988) (a prior restraint occurs not only when "official restrictions [are] imposed upon speech or other forms of expression in advance of actual publication," but also when "expression is foreclosed prior to an adequate determination that it is unprotected by the First Amendment."); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (unless the prior restraint falls "within one of the narrowly defined exceptions to the prohibition

against prior restraints," the action resulting in the prior restraint must comply "with procedural safeguards that reduce the danger of suppressing constitutionally protected speech."); *In re Murphy-Brown, LLC*, 907 F.3d 788, 799 (4th Cir. 2018) (restrictions on speech must be no "greater than necessary"); *but see Alexander*, 509 U.S. at 550 (defining a prior restraint as an action that "*forbid[s]* certain communications when issued in advance of the time that such communications are to occur") (emphasis in original). In any event, given the large volume of non-responsive documents among the Seized Material, the Court cannot ignore the seizure's effect on Natanson's ability to function as a journalist. Nor can the Court ignore, whether intended or not, the harassing and chilling effects such a seizure could have on a reporter, particularly one focused on Executive Branch conduct and where the Government contends that "all of the [Seized Material] is presumptively relevant to the investigation at this point." [Doc. No. 94] at 16; *see also Branzburg v. Hayes*, 408 U.S. 665, 707–08 (1972) ("Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification.").

C. The Seized Material Includes Documents Protected by the Privacy Protection Act

In response to the Supreme Court's decision in *Zurcher v. Stanford Daily*,[11] Congress enacted the PPA of 1980, to afford "the press and certain other persons not suspected of committing a crime with protections not provided currently by the Fourth Amendment." S. REP. No. 96–874, at 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3950. The PPA makes it "unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal

---

[11] In *Zurcher v. Stanford Daily*, the Supreme Court held that the First and Fourth Amendments do not categorically bar search warrants directed at newsrooms. 436 U.S. 547, 565 (1978) (addressing whether the application for a search warrant must establish special circumstances before a warrant to search the office of a news agency may lawfully issue).

offense, to search for or seize any work product materials"[12] or "documentary materials"[13] that are "reasonably believed to have a purpose to disseminate to the public" a "public communication" such as "a newspaper, book [or] broadcast]." 42 U.S.C.§ 2000aa(a)-(b). The statute includes a suspect exception if the Government demonstrates "probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate" and "the offense consists of the receipt, possession, or communication of information relating to the national defense." *Id.* § 2000aa(a)(1). The statute provides additional exceptions for the search and seizure of "documentary materials" that are at risk of being destroyed or tampered with, *id.* § 2000aa(b)(3)-(4), and also for "contraband or the fruits of a crime," which are excluded from the definitions of "work product" and "documentary" materials. *Id.* § 2000aa-7(a), (b).

Recognizing "the personal privacy interests of the person in possession of such documentary materials," the statute requires the government to utilize "the least intrusive method or means of obtaining [documentary materials covered by the statute] . . . which do not substantially jeopardize the availability or usefulness of the materials sought to be obtained." *Id.* § 2000aa-11. As the Magistrate Judge recognized, "[t]he PPA embeds a structural preference for subpoenas over search warrants," [Doc. No. 62] at 11, given the "immedia[te] and intrusive[]" nature of a search and seizure, which unlike a subpoena, does not allow for "an adversary process that can command the production of documents and things only after judicial process is afforded."

---

[12] The statute defines "[w]ork product materials" as those such prepared in "anticipation of communicating to the public," including "mental impressions, conclusions, opinions, or theories" of the author, but excludes "contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used, as the means of committing a criminal offense." 42 U.S.C. § 2000aa-7(b).

[13] The statute defines "documentary materials" as "materials upon which information is recorded, and includes, but is not limited to, written or printed materials . . . but does not include . . . the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use . . . of committing a criminal offense." *Id.* § 2000aa-7(a).

*In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000); *Citicasters v. McCaskill*, 89 F.3d 1350, 1357 (8th Cir. 1996) (Bright J., concurring in part and dissenting in part) ("Under the [PPA], the government may not obtain a search warrant but must instead rely upon a subpoena duces tecum or the voluntary release of the materials."). And the Department of Justice's own guidelines provide that "[t]he Department views . . . subpoenas . . . and search warrants to seek information from, or records of, non-consenting members of the news media as extraordinary measures," 28 C.F.R. § 50.10(a)(3), and search warrants require, among other safeguards, the use of "search protocols designed to minimize intrusion into potentially protected materials or newsgathering activities unrelated to the investigation" and "filter teams," *id.* § 50.10(d)(4).

The Government submits that because the search warrant sought materials violating 18 U.S.C. § 793 (the criminal statute that prohibits retaining national defense information), the Seized Material is definitionally excluded from the PPA's protections because they are "contraband or the fruits of a crime." [Doc. No. 74] at 29 (citing 42 U.S.C. § 2000aa-7(a), (b)). But as the Government concedes, the seized data "almost certainly includes PPA-protected materials." [Doc. No. 74] at 29–30. Nevertheless, the Government's position is, in substance, that anytime it seeks "contraband or the fruits of a crime" it can ignore, and in effect nullify, the statutory protections that make it unlawful to "search for or seize any work product materials possessed by" a journalist, if those protected materials are interspersed amongst alleged unprotected materials. *See* 42 U.S.C. § 2000aa(a); *see also* 42 U.S.C. § 2000(b) (making it likewise unlawful to seize "documentary materials."). That position is untenable given the plain language of the PPA, which the Court concludes bars the Government from searching in this particular case the PPA-protected materials that were seized. *See Guest v. Leis*, 255 F.3d 325 (6th Cir. 2001) (even though there is no government liability under PPA for seizure of PPA-protected materials "commingled on a criminal

15

suspect's computer with criminal evidence that is unprotected by the act," the "police may not then search the PPA-protected materials that were seized incidentally to the criminal evidence").[14]

For these reasons, the Seized Material includes documents protected from search and seizure under the PPA.

### D. The First Amendment and PPA Mandate Judicial Review of the Seized Material

Having concluded that the Seized Material includes documents protected and/or privileged by both the First Amendment, the PPA, and the attorney-client privilege, the Court considers whether the judicial review ordered by the Magistrate Judge is appropriate or whether, as the Government requests, the Court should overrule the Magistrate Judge's Order and authorize the Government to search the seized devices using a filter protocol that "would segregate information that is outside the warrant's scope, privileged, or otherwise protected and would send all other information within the scope of the warrant to the prosecution team." [Doc. No. 74] at 27.

As the Fourth Circuit has recognized, "no governmental interest is more compelling than the security of the Nation," *Sterling*, 724 F.3d at 509 (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)). "This interest extends to 'protecting both the secrecy of information to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.'" *Id.* (quoting *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008)). Relatedly, the Government has the power and duty to investigate criminal wrongdoing. *See Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) (The "power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws."). But the Government's legitimate interest in protecting the

---

[14] Nor can the Government invoke the statute's suspect exception, discussed above, because it has not established, nor has the Government contended, that it has "probable cause to believe" that Natanson, as "the person possessing such materials," "has committed or is committing the criminal offense to which the materials relate." *Id.* § 2000aa(a)(1), (b)(1).

16

community is not absolute and does not subordinate in wholesale fashion protected individual civil liberties. *In re Directives Pursuant to Section 105B of Foreign Intel. Surveillance Act*, 551 F.3d 1004, 1016 (Foreign Int. Surv. Ct. Rev. 2008) ("[T]he Constitution is the cornerstone of our freedoms, and government cannot unilaterally sacrifice constitutional rights on the altar of national security."); *United States v. Muhtorov*, 20 F.4th 558, 662 (10th Cir. 2021) (Lucero, J., dissenting) ("No governmental interest, however, not even the most compelling interest of national security, permits the government to disregard fundamental constitutional rights of individuals.").

Where, as here, there are competing interests to be weighed, the judiciary is often tasked with "balanc[ing] between the conflicting and sensitive interests at stake." *United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973); *see also Baltimore Law Firm*, 942 F.3d at 181 (holding that government's filter team was "simply 'incompatible with courts' historical protection of the attorney-client privilege and the work-product doctrine").

In *Baltimore Law Firm*, a case with several parallels to this case, the Fourth Circuit recognized that the resolution of privilege issues "is a judicial function." 942 F.3d at 176. There, the Fourth Circuit held that the "magistrate judge erred in assigning judicial functions to the Filter Team, approving the Filter Team and its Protocol in *ex parte* proceedings without *first* ascertaining what had been seized in the Law Firm search, and disregarding the foundational principles that serve to protect attorney-client relationships." *Id.* at 181 (emphasis added). The Court then "advised the magistrate judge to review all seized materials, identify those [materials not responsive to the search warrant] and return them to the Law Firm, and conduct a privilege evaluation of the remaining materials." *Id* at 170. Among the concerns for the Fourth Circuit was the lower court's failure to consider that fewer than one percent of the seized records was

17

responsive to the warrant, such that the government's filter team would be authorized to "rummage through attorney-client communications" unrelated to the investigation. *Id.* at 176 ( "Put simply, a court is not entitled to delegate its judicial power and related functions to the executive branch, especially when the executive branch is an interested party in the pending dispute.").

As in *Baltimore Law Firm*, this case requires an independent judicial officer to conduct a review of the Seized Material to adequately protect Movants' constitutional and statutory interests. As mentioned above, allowing the Government to implement its proposed filter protocol would, in effect, nullify the protections afforded under the PPA and the First Amendment and given the volume and likely protected and/or privileged nature of the non-responsive Seized Material relative to the likely number of responsive documents, a judicial review of those materials is the only method by which to protect those privileges and protections, while at the same time preserving the Government's right to obtain responsive documents. *See id.*; *see also In re Search of Elec. Commc'ns*, 802 F.3d 516, 530 n.53 (3d Cir. 2015) ("Of course, a court always retains the prerogative to require a different method of review in any particular case, such as requiring the use of a special master or reviewing the seized documents in camera itself."); *United States v. Rayburn House Off. Bldg., Room 2113, Washington, D.C. 20515*, 497 F.3d 654, 663 (D.C. Cir. 2007) (privilege holder must have "an opportunity to assert the privilege," and obtain judicial review, "prior to disclosure of privileged materials to the Executive"); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3d Cir. 1984) (ordering government to return documents seized from law firm and suggesting appointment of a special master "to examine in camera any material that the law firm objects to producing").

18

The Government contends that, given the presence of classified information, the Magistrate Judge's exercise of that core judicial function is inconsistent with the separation of powers since (1) a judicial review would intrude on the Executive's duty to enforce the laws; (2) the Court is ill-equipped to determine what is classified; and (3) the Court's review "creates the chance for unauthorized and unintended dissemination of classified material." [Doc. No. 94] at 6. None of these arguments counsels against judicial review in this case.

As to the first concern, the Government contends that unlike in those cases where judicial review was authorized, including *Baltimore Law Firm,* the Magistrate Judge, in deciding to conduct a judicial review of the seized material, became, in substance, "a member, if not the leader, of the search party which [is] essentially a police operation," and therefore exceeded his role as a judicial officer and invaded the exclusive province of the Executive Branch. *See* Doc. No. 74 at 11 (citing *Lo-Ji Sales, Inc. v. New* York, 442 U.S. 319 (1979)). But unlike the judicial officer in *Lo-Ji Sales,* Judge Porter played no role in the execution of the search warrant or deciding what objects and materials the Government seized in execution of the warrant, and the role he has assigned to himself is no different, in substance, than the role assigned to the magistrate judge by the Fourth Circuit in *Baltimore Law Firm.* That the materials to be reviewed in this case are in electronic storage and need to be accessed through some process does not transform the Magistrate Judge into a member of the Government's team that executed the search warrant and seized the objects that contain the materials to be reviewed, just as it did not transform the role of the magistrate judge in *Baltimore Law* Firm. And in substance, the judicial review of the Seized Material in this case will be no different than the judicial review of the content of voluminous

19

documents initially presented to a court in hard copy, particularly where in today's legal environment those documents would typically be downloaded into a database.[15]

The Government also contends that given the classified nature of responsive documents, the Court lacks the requisite expertise to identify those responsive documents. The responsive documents here are subject matter specific documents well within the ability of the Magistrate Judge to identify, not only with the help of the Government, Natanson and the Washington Post, but also in light of the likely non-classified nature of some of the responsive documents, such as the news articles published and communications between Natanson and Perez-Lugones. In that regard, the Government has been ordered to propose a process for that review, presumably reflecting the process it would use, including "a list of proposed non-confidential search terms" and "confidential search terms," the latter of which may be provided to the Court *ex parte*. [Doc. No. 109].[16] Those procedures are not before the Court but to the extent that the Government believes those procedures do not adequately identify and protect responsive documents, those issues can be presented to the Court.

The Government's final argument is that a judicial search is logistically unworkable due to the "difficulties" a judicial review would face, such as determining "the best place, platform and technology for review." [Doc. No. 74] at 15. It is unclear is why these "difficulties" would be any different for the Government than the Court. But more to the point is that the Court is often called

---

[15] The Government contends that *Baltimore Law Firm* is distinguishable because the privileged documents had already been identified for review and did not involve the courts' conducting a search for those documents in the first instance. [Doc. No. 94] at 1, 3. Unclear is the support for that contention since central to the Fourth Circuit's holding is that the "magistrate judge erred in assigning judicial functions to the Filter Team, approving the Filter Team and its Protocol in *ex parte* proceedings without *first* ascertaining what had been seized in the Law Firm search . . . ." 942 F.3d at 181 (emphasis added). In any event, the Government's apparent argument that, at most, a judicial privilege review should only occur after an assertion of privilege on specific documents would appear to support the outcome that Movants, rather than the Government or the Court, should take the initial pass through the Seized Material to identify what, if anything, is privileged.

[16] Movants have also been ordered to participate in developing that review process. *See* [Doc. No. 109].

20

upon to review classified information, often voluminous, without being stymied by issues pertaining to "the best place, platform and technology for review."

## IV.    CONCLUSION

For the above reasons, the Court concludes upon a *de novo* review that judicial review of the Seized Material is warranted and also that the Magistrate Judge's decision to do so was not clearly erroneous or contrary to law. Accordingly, it is hereby

**ORDERED** that the Objections of the Government [Doc. No. 74] be, and the same hereby are, **OVERRULED** and the decision of Judge Porter to proceed as set forth in his Memorandum Opinion and Order is **AFFIRMED**.

The Clerk is directed to send copies of this Order to all counsel of record.

Alexandria, Virginia
May 4, 2026

Anthony J. Trenga
Senior United States District Judge

21