UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE REAL PROPERTY AND PREMISES OF HANNAH NATANSON | Case 1:26-sw-54<br>Alexandria, Virginia<br>April 9, 2026<br>10:00 a.m.<br>Pages 1 - 37 |

# TRANSCRIPT OF OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM OPINION AND ORDER ON THE MOTION FOR RETURN OF PROPERTY

BEFORE THE HONORABLE ANTHONY J. TRENGA
UNITED STATES DISTRICT COURT JUDGE

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

APPEARANCES:

FOR THE UNITED STATES OF AMERICA:

CHRISTIAN DIBBLEE, ESQUIRE
ALEX HAAS, ESQUIRE
DAVID COURCHAINE, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
1100 L Street, N.W.
Washington, D.C. 20005
(202) 514-1944

ANTHONY AMINOFF, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR *THE WASHINGTON POST*:

SIMON A. LATCOVICH, ESQUIRE
NICHOLAS GAMSE, ESQUIRE, *PRO HAC VICE*
TOBIN J. ROMERO, ESQUIRE, *PRO HAC VICE*
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
(202) 434-5967

JAY KENNEDY, ESQUIRE
AARON GOETZL, ESQUIRE
MICAH RATNER, ESQUIRE
THE WASHINGTON POST GENERAL COUNSEL

FOR HANNAH NATANSON:

DOROTHY A. JEFFRESS, ESQUIRE
TRISHA ANDERSON, ESQUIRE, *PRO HAC VICE*
HECKER FINK, LLP
1050 K Street, N.W., Suite 1040
Washington, D.C. 20001+
(202) 742-2655

P R O C E E D I N G S

THE COURTROOM DEPUTY: Case No. 1:26-sw-54, *United States of America v. 313 South Royal Street, Alexandria, Virginia.*

Counsel, will you please note your appearances for the record.

MR. AMINOFF: Good morning, Your Honor. Anthony Aminoff from the U.S. Attorney's Office, and I'm joined at counsel table by Christian Dibblee, Alex Haas, and David Courchaine from the Department of Justice. Mr. Dibblee will be handling argument.

THE COURT: All right. Welcome.

MR. LATCOVICH: Good morning, Your Honor. Simon Latcovich from Williams & Connolly. With me today is Nicholas Gamse and Toby Romero from Williams & Connolly on behalf of *The Washington Post*.

Also here today from *The Washington Post* is our lawyers from *The Post*'s general counsel's office, including Jay Kennedy, Aaron Goetzl, and Micah Ratner.

Also present is the publisher of *The Washington Post*, Jeff D'Onofrio, and the executive editor, Matt Murray.

THE COURT: All right. Welcome.

MS. JEFFRESS: And good morning, Your Honor.

THE COURT: Good morning.

MS. JEFFRESS: Amy Jeffress representing Hannah Natanson, and with me is my partner, Trisha Anderson.

THE COURT: All right. Welcome to everyone.

We're here on the government's objections to Judge Porter's order requiring judicial review of the seized documents. I've reviewed the briefing and would be pleased to hear further from counsel.

MR. DIBBLEE: Thank you, Judge Trenga.

THE COURT: Yes.

MR. DIBBLEE: As my colleague mentioned, my name is Christian Dibblee on behalf of the government in this case.

The government investigator seized devices belonging to Hannah Natanson because they had probable cause to believe those devices contained evidence of a crime, namely, the unauthorized disclosure of classified and national defense information. No one disputes that statement or says otherwise. Nonetheless, the magistrate judge ruled that he would be the one to search those devices for that evidence.

We submit that decision was erroneous. As a constitutional matter, the judiciary cannot join a search party, which is an executive function, and that function is particularly important in this case.

The government has a unique interest in and ownership over the classified and national defense information that is likely on these devices. The government then must be the one to conduct this particular search as the entity constitutionally charged with protecting that type of information.

The magistrate judge reached an alternative conclusion because of the First Amendment. Again, as a constitutional matter, that amendment does not require the kind of judicial search procedure that the magistrate judge ordered.

This case does not involve prior restraint, and the Supreme Court and Fourth Circuit have held that there is not a reporter's privilege in a case like this.

The proper way forward, we submit, is a government filter team, which is simultaneously protecting this privileged information and the government's interests in classified material.

THE COURT: Let me ask you this: Shouldn't the Court consider Judge Porter's decision for judicial review of those documents against what he could have done, which was to enforce the Privacy Protection Act and the procedures under there for obtaining these documents? Still, I don't quite understand why the

procedures in that statute didn't apply and why the Court shouldn't measure what Judge Porter did against what he could've ordered under that statute.

We are talking about an executive function. Certainly, under that statute, typically, the government would not be reviewing the documents. It would be the person who received the subpoena. It would be *The Washington Post* who received its subpoena.

So this notion that there's this exclusive right to any kind of classified documents to be reviewed, I don't quite understand that. And when you view that against what is clearly the judicial requirement, the judicial obligation to review privileged documents, attorney-client privileged documents that are protected under the Privacy Protection Act, I don't quite understand the government's position.

I would think that the government would have been somewhat happy with Judge Porter's decision to engage in judicial review rather than delegating that, as he could have, to Ms. Natanson and *The Washington Post*.

MR. DIBBLEE: I think it's true that we fought very hard before Judge Porter to ensure that the devices were not returned to Ms. Natanson and *The Post*

for them to conduct their own unilateral review. That's correct. Nonetheless, the government still takes the position that what he ordered is inappropriate.

I think to answer perhaps your questions about the PPA --

THE COURT: Yes.

MR. DIBBLEE: -- we've made these points in our brief. The PPA applies only to particular materials in the possession of a journalist. It does not apply to fruits of a crime or contraband, and this warrant authorizes the government to seize fruits of the crime, specifically, things that are related to -- they're from Mr. Perez Lugones or are related to his --

THE COURT: But doesn't that statute require to authorize that with respect to fruits of a crime that may otherwise be protected by way of a search warrant only if there's a probable cause showing that the journalist in this case committed the offense for which the documents were sought?

MR. DIBBLEE: I don't know that that's correct, Your Honor. What it says is it defines work product materials and documentary materials, which are in -- which it has things for which the government must first obtain a subpoena and it cannot obtain a search

warrant.

But the definition of those terms, documentary materials and work product materials -- this is 42 U.S.C. § 2000aa-7. Subsection (a) and (b) define "documentary materials" and "work product materials." Those definitions say that they refer to materials other than contraband or fruits of a crime. I'm looking at both of them right now.

So documentary materials, the statute gives a long definition and then says, "...but does not include contraband or the fruits of a crime or things otherwise criminally possessed...."

For work product materials, it says, "Work product materials, as used in this chapter, means materials, other than contraband or the fruits of a crime...."

THE COURT: But does it say you can get those by way of a search warrant as opposed to a subpoena absent a showing that the holder of those documents was the person who committed the crime?

MR. DIBBLEE: The PPA requires a subpoena for documentary materials and work product materials as defined in the statute. So to read the statute the way that we do, if materials do not fall within those definitions, then the government can seek a search

warrant to obtain that type of evidence.

THE COURT: All right. I am really having difficulty understanding that reading of the statute --

MR. DIBBLEE: Okay. You know, I --

THE COURT: -- because it talks about it's unlawful to get work product or other protected documents, and then it also talks about how it's also unlawful to protect documents other than work product and protected documents under a similar procedure.

And I think the requirements for a search warrant requires a probable cause showing that the person who has those has been the person who committed the offense. That's my reading of it.

MR. DIBBLEE: And so I don't believe that that is correct. I'm fairly certain that the government is able to obtain search warrants, at least in the usual course, against any subject who they have probable cause to believe is in possession of evidence.

And I would just direct Your Honor to the definitions of "documentary materials" and "work product materials," which do carve out from those definitions things that are evidence -- excuse me, are fruits of a crime or contraband.

And we would submit that this --

THE COURT: Right. But the question is how

do you get those? Do you get those by way of a subpoena or by way of a search warrant?

MR. DIBBLEE: Yes. Nothing in the PPA says that the government must first obtain a subpoena for fruits of a crime or contraband. Those terms are specifically not included in the definition of "work product materials" and "documentary materials," Where it is true that if these documents did fall into those definitions, the government under the PPA would need to first obtain a subpoena.

Our position is that this warrant is authorized -- or excuse me, does not violate the PPA because it seeks evidence of a crime, fruits of a crime or contraband. I hope that that's helpful.

I guess I think to start -- just to go back to some of the issues that we have -- some of the arguments that we've made --

THE COURT: Well, the other core basis for his opinion was the pronouncements of the Fourth Circuit involving the *Baltimore Law Firm* case.

MR. DIBBLEE: Yes, sir.

THE COURT: What's your response to that? These issues were clearly presented to him. They found the judicial role important notwithstanding the executive branch interests.

MR. DIBBLEE: Yes. So about *Baltimore Law Firm*, *Baltimore Law Firm*, we think, really should be read in the context of it's very, very unique facts. The majority opinion makes that point plain when it talks about, quote, in these circumstances.

And the Judge Rushing's concurrence also references the unique facts and circumstances about the case that came before the Fourth Circuit there. There is a big difference between this case and that case. Well, excuse me, there are several big differences.

The first one that comes to mind is that there was no discussion in that case about the government's unique interest in and equity over classified or national defense information. That was not part of the *Baltimore Law Firm* case. It is a part of this case. And I think that that is sort of one of the many big differences.

The other big difference that really concerned the Fourth Circuit in that case was -- I can think of two immediately off the bat. The magistrate judge there had approved a procedure, an *ex parte* proceeding without knowing yet what the government had searched. We have not done that here. We are obviously before you in an adversarial process.

The other thing is that that Filter Team

included agents who were investigating other clients of the law firm, such that they would have been able to review documents about subjects for whom the government had not sought a search warrant. And I would -- there is nothing like that going on here as well.

I think the other point that I do want to make about *Baltimore Law Firm* is that *Baltimore Law Firm*'s reasoning is extremely cabined to the attorney-client privilege. And even then, that case involves an extremely unique situation where almost all of the documents that had been seized there were covered by the attorney-client privilege.

Movants, I think, want to extend the unique holding of that case, which involves -- to this one. Now, this case involves a much, much, much smaller amount of attorney-client privileged material, but they want to extend it on the basis that there is a First Amendment privilege over -- I think over all of the information or at least the vast, vast, vast majority of the information on these devices.

Now, we've made the argument that there is no such privilege, and I don't think that movants can bootstrap a case that is a unique case about a particular privilege to then apply to this case, where there is not an accepted privilege that applies to over

99 percent of these documents, as was the case in the *Baltimore Law Firm* decision.

And I do think that extending *Baltimore Law Firm* in that manner could have some startling consequences for criminal prosecutions that would involve a large trove of documents.

It just cannot be that a device is suddenly off limits to a Filter Team because there was material on it that is somehow -- that is privileged in some capacity. *Baltimore Law Firm* dealt with an extremely unique situation, and I think that the opinion should be read that way.

If Your Honor would like, perhaps I could maybe talk about some of the First Amendment privileges stuff, as I just mentioned that.

THE COURT: All right.

MR. DIBBLEE: We don't think that the First Amendment should short-circuit the ability of the government to conduct a search here, nor does the First Amendment require different procedures like what the magistrate judge ordered.

I think it's helpful just to remember some basic praecipes from the Supreme Court which have made clear that reporters do not receive any kind of different, differential, or special treatment when

subject to a criminal process.

The *Branzburg* case, "...otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed."

The *Zurcher* case also very firmly rejects the notion that there needs to be some special procedure when the government seeks a search warrant regarding journalistic premises.

Now, we've talked about the PPA. And obviously, the PPA was enacted after that decision. So, you know, I am not in any way suggesting that what I said earlier about the PPA doesn't apply. But I do think that these cases make clear that there is no special solicitude given to reporters when they are subject to criminal process.

And the other side has suggested that there was a prior restraint in this case. I admit it's a little unclear to me exactly what created the prior restraint, whether it was the seizure now or whether it is -- what would happen if the government were to review these devices. But neither involves prior restraints.

Prior restraints are very special and particularized restriction on First Amendment

expression, and the Supreme Court has defined them as the state forbidding communications in advance or having the ability to block those communications in advance. Such as when you want to put on a play and you have to get a license from the state to do so, that creates a prior restraint situation.

Ms. Natanson is not subject to any such restraint. She can publish now. She is capable to do so today, tomorrow. She can cultivate new sources. She is able to do all of those things.

THE COURT: Well, I think that's their position, that the seizure physically removed materials from her but basically dried up her sources in light of the government's threat to seize whatever information they provide.

MR. DIBBLEE: Yes. Fair enough. That position has also been expressly rejected by the Supreme Court. So I'm going to take it just in two chunks, if I could.

THE COURT: Yes.

MR. DIBBLEE: First, there's the argument that her job now as a reporter doing journalistic activities is more difficult because of what the government has done here. But a prior restraint depends on the existence of a government action that

tells a reporter -- or really anyone engaged in First Amendment activity -- you cannot do this anymore.

I would direct the Court to the decision by the Supreme Court from 1986 in *Arcara v. Cloud Books*. In that case, the owners of an adult bookstore had their store closed down by the State of New York because there were other actions going on at that location that violated public lewdness laws. They challenged the seizure order to the closure order and argued that they were being subject to a prior restraint because they could not sell books anymore. The location where they did so had been closed down.

I think that it's helpful to read out exactly what the Supreme Court said in footnote 2 of that opinion: This order, quote, will impose no restraint at all on dissemination of particular materials since respondents are free to carry on their book-selling business at another location even if such locations are difficult to find, end quote.

Now, I think that that is directly appropriate for the argument that the movants are making here. The fact that it is difficult for her to engage in her journalistic activities does not mean she is subject to a prior restraint that is blocking her expressive activity.

And I think as far as the chill on current and future sources -- which I think is their other argument, that that creates a prior restraint -- I would direct the Court to the *Branzburg* and *Sterling* opinions. *Branzburg* very clearly says that a chill on confidential sources does not create a reporter's privilege.

The *Sterling* case makes the exact same point, and I believe *Branzburg* -- this is page 695 -- says public interest in possible future news does not take precedence over the public interest in pursuing and prosecuting crimes. And the Supreme Court in *Branzburg* said there was no prior restraint in that chase.

So I think it's helpful to note, because if there is a prior restraint based on the chill for confidential sources, you would think that it might be apparent in the *Branzburg* case. The Supreme Court said no.

I mean, nonetheless -- we have said this in our reply brief -- the government understands Ms. Natanson's equities here, and it will be prioritized in the return of her contact list if the government is allowed to undertake the search that it's proposing.

Just maybe perhaps one more point on the

First Amendment, if I may.

THE COURT: All right.

MR. DIBBLEE: There was a discussion in the briefs about a qualified reporter's privilege or the extents to which there is a reporter's privilege in a case like this. We disagree with the movants about the applicable precedent here, which is the *Sterling* case. There the Fourth Circuit made clear that because a subpoena was issued in good faith and based on a legitimate need of law enforcement, there was no special showing needed to obtain evidence of criminal conduct from a reporter in a criminal proceeding.

And the only difference between that reasoning and this case is that this case involves a search warrant and that case involved a subpoena. But the Fourth Circuit in *Sterling* made clear that the subpoena was motivated by a compelling public interest in effective prosecution investigation of crimes, such that the usual rules that apply in civil cases don't apply.

A search warrant is based on the exact same compelling interest, and there's no reason to cabin *Sterling*'s logic to just involving a subpoena, particularly when -- if anything, there is less room for a reporter's privilege where the government must go

to a magistrate or to a judicial officer and obtain a signature before they can undertake a search warrant, which they can't do with a subpoena.

I would like to respond briefly to the point that the movants make. They suggest that *Sterling* creates a privilege only over a limited amount of journalistic data. So they say that it does not apply when -- to data that is -- I think the word is, quote, remote and tenuous, unquote, to the investigation.

I'm not conceding that they are reading *Sterling* correctly. In fact, I think that *Sterling* makes clear that anytime the government is engaged in a good faith exercise of criminal process that is not based on harassment of the press, then there is a -- and there is no reporter's privilege.

But even if the movants are reading *Sterling* correctly, it is premature to invoke that privilege. As of this moment, the government does not know what information on Ms. Natanson's devices is related to this investigation. It has not had the chance to look at them yet. So to the extent that that qualified privilege might exist over some of the devices, we think that it's premature to invoke that given the government still has a legitimate need in the entirety of the devices, at least as of now.

THE COURT: How many documents do you think we're talking -- how many were seized from Mr. Lugones?

MR. DIBBLEE: From Mr. Perez-Lugones?

THE COURT: Yes.

MR. DIBBLEE: I don't know. I also don't know how many documents there are -- or excuse me, documents listed -- how many -- the size of the materials on these devices. I know the movants have given a number that, I think, is several terabytes.

THE COURT: No. I'm talking about the classified documents that were identified as having been given from Lugones.

MR. DIBBLEE: So there are five classified documents from Mr. Perez-Lugones that the government has probable cause to believe were sent to Ms. Natanson. So that's what we're talking about.

Of course, Ms. Natanson could have transmitted those documents or information from those documents further on. So now the standing need -- and perhaps the small number of documents that I just gave, the government is still entitled to determine the extent to which those documents have been disseminated further. And they also are entitled to seek a search warrant to corroborate their allegations against Mr. Perez-Lugones. So it makes sense for the

government to seek both sides of the communication relationship here.

THE COURT: Well, what's the scope of the search warrant? The search warrant was limited to the documents that Ms. Natanson received from Lugones, correct?

MR. DIBBLEE: Not entirely, Your Honor. The search warrant was for documents that were from Mr. Perez-Lugones or that related to him.

Okay. I just wanted to maybe make one final point, if it's all right. I just wanted to say that the executive obviously has a Constitution to protect classified information. That's part of the *Department of Navy v. Egan* case, and I know that Your Honor is well experienced in those issues.

The information here is classified Top Secret and Secret, which means its disclosure would reasonably be expected to cause exceptionally great damage and/or serious damage to national security. There is also SCI information that Mr. Perez-Lugones allegedly transferred. SCI involves intelligence analysis, sources and methods, such that needs to be handled in particular settings.

The other thing to mention is that there is national defense information that is also at play here.

National defense information is not defined as a statutory matter, but in general, that is information that the government is able to prove would be potentially damaging to the United States or might be useful to an enemy of the United States in the event of its disclosure and is closely held.

So we -- the government, I think, does have a -- has a role to play in this particular search given the equities that are involved in classified material, which, as I said, is somewhat unique to this case and it is not something we have seen in other cases.

Thank you very much.

THE COURT: Thank you.

MR. DIBBLEE: I appreciate it.

Will I have any time for rebuttal?

THE COURT: Yes.

MR. DIBBLEE: Okay. Thank you, Your Honor.

MR. LATCOVICH: Good morning, Your Honor. Simon Latcovich for *The Washington Post*.

I have some prepared remarks, but I'm going to try to tailor them, Your Honor, to the --

THE COURT: Tell me your view of the applicability of the PPA to this situation.

MR. LATCOVICH: I think in some ways, Your Honor, the applicability of the PPA is very simple.

Even if you accept the idea that the PPA -- that an exception to the PPA might apply very narrowly to the documents that were received from Mr. Perez-Lugones, it does not apply. There is no exception that applies to the remainder of Ms. Natanson's work product that was seized, and the government in no place in any of its briefings even attempts to make that showing.

So I think the PPA has a massive role to play, particularly for the nonresponsive materials, especially for the nonresponsive material. And I think that's precisely why Judge Porter was upset about not being told about that, because he may have tailored the process differently.

THE COURT: What authorizes a search warrant as opposed to a subpoena under the PPA?

MR. LATCOVICH: I think you have to have -- as I read the PPA, Your Honor, it requires probable cause that the reporter for whom you're seeking materials has committed a crime.

THE COURT: That was my reading, but I think that's what is being debated.

MR. LATCOVICH: Right. But I think even if you set that aside, Your Honor, there is no dispute whatsoever that the PPA applies to all the material outside the warrant, and so that is where there is an

issue.

Your Honor, you started your discussion today by saying why should we not compare Judge Porter's ruling to what he could have done under the PPA, and I think it's interesting. If you actually look at what circuit courts have done in terms of filtering requests from the government, it's not what you would think from reading the government's briefing.

First of all, the *Baltimore Law Firm* case directly addresses this issue and more specifically than just a privilege review. There the court said, "We advised the magistrate judge to review all seized materials, identify those not related to Client A and return them to the Law Firm, and conduct a privilege review of the remaining materials."

So this is a responsiveness relief for the warrant and then a privilege review for those materials that are actually responsive. That's exactly what Judge Porter did here.

But you raised the question what else could Judge Porter have done. I think if you actually look at the circuit court cases that have addressed this, you actually see positions that favor our position, not the government.

So, for example, in the *Rayburn House*

*Building* case, the D.C. Circuit, the privilege holder themselves did the review.

In *Klitzman* in the Third Circuit, cited in our briefs, the court ordered the return of all materials and, again, had the privilege review of those materials.

In the Third Circuit case that the government cites, *In re Search of Electronic Communications*, regarding Congressman Fattah, the congressman forgot to object to the Filter Team, did not object to the Filter Team, Your Honor. But even there the Third Circuit said: Don't forget, or you could have had the magistrate judge review these materials.

In the Eleventh Circuit, the *In re Sealed Search Warrant Application*, that case distinguished *Baltimore Law Firm* and then had the privilege holder do the first review.

And in the *In re Grand Jury Subpoenas* case in the Sixth Circuit, again, the Filter Team challenged, and the privilege holder did the review.

So to the extent Judge Porter's position is an outlier, it's an outlier that he is doing the review rather than the privilege holder. None of those cases actually support the government's position.

As far as the separation of powers argument,

Your Honor, the government overreads *Lo-Ji Sales* beyond recognition. That case involves -- well, the Supreme Court there held the search violated the Fourth Amendment because the warrant was open-ended. Literally, the warrant was blank. And the magistrate let them participate in the search, and the warrant was filled in later. That's a far cry from this case.

But I think another important point that you won't find in the papers is that the government made this very same argument in the *Rayburn House Office Building* search before the D.C. Circuit, and in its cert petition afterwards, that argument was not accepted there, Your Honor. And it should not be accepted here.

Your Honor, as far as the First Amendment protections that you got to at the end, I mean, the government is just misreading *Sterling*. The Fourth Circuit was clear that its holding did not apply to cases or materials where there was only a tenuous relationship to the investigation. The government here concedes that there's actually no relationship whatsoever to the investigation for the great majority of these materials.

And it's not as if we're trying to read something into this Fourth Circuit opinion. I'm going

to quote *Sterling* at 724 F.3d at 505: "For the foregoing reasons, we hold that there is no First Amendment or federal common-law privilege that protects Risen from having to respond to the government's subpoena and give what evidence he has of the criminal conduct at issue." At issue, Your Honor. All of these irrelevant materials are not at issue, and we should not rewrite the Fourth Circuit's opinion.

As far as prior restraint, the government takes a very drab review of prior restraint requiring a claim that requires a government order preventing a particular publication. That's just not what the law is, Your Honor. A government seizure that substantially impairs or prevents future publication or if it constitutes a prior restraint.

And I would encourage the Court, if you're concerned about this, to review the Supreme Court's decision in *Miami Herald*, 418 U.S. 241. And there the Supreme Court said the opposite of what the government says today. They said that a government restraint need not fall into familiar or traditional patterns.

And the facts there are interesting, Your Honor. There was no order that required preventative particular type of speech. To the contrary, there was a Florida statute that required newspapers to give

print space to political opposition candidates, kind of an equal time type of scenario. So that's actually more speech, not a restriction on a particular type of speech. And the court said that was a restraint on speech because the additional cost of printing is a burden on speech.

Here we have the same thing. We can't expect Natanson to re-create more than 1,200 contacts, reestablish these relationships, her drafts, her communications all taken. So I think that under the *Miami Herald* case, Your Honor, disposes of that argument.

The government also mentioned *Branzburg*, Your Honor. There you had one source at issue for each of those reporters, not 1,200 sources. That is a very different issue.

Also, Your Honor, I think the key thing about *Branzburg* is its emphasis on the information being sought from the reporter was relevant to the criminal investigation. Again, the nonresponsive materials here don't fall under *Branzburg*.

Your Honor, one additional point on the PPA. As we disclosed, the government did not disclose that to Magistrate Judge Porter. I think that seriously undermines the government's request to this Court or

that this Court trust the Filter Team to safeguard the very privileges that the government failed to disclose in the first instance, and we obviously are particularly concerned about that.

Finally, Your Honor, I think the government's legitimate interests are fully protected by the magistrate judge's order. The government gets to retain the preservation copy of the materials, and it's going to receive all nonprivileged materials responsive to the warrant. What the government should not receive is permission to rummage through the entirety of a reporter's universe simply to look for a handful of responsive documents.

We, therefore, request that the Court overrule the objection and affirm Magistrate Judge Porter's order.

THE COURT: All right. Thank you.

MR. LATCOVICH: Thank you, Your Honor.

Ms. Natanson's counsel?

THE COURT: Yes.

MS. JEFFRESS: Thank you, Your Honor.

I want to follow up just briefly on the prior restraint point and completely concur with Mr. Latcovich's explanation.

But just to explain, I don't believe that the

government understands how Signal works, and this was not just an action that chilled Ms. Natanson's sources, but when the government took her phone, they took her Signal account, and she can't access that without her phone. And so all of her sources that were in her Signal account are gone and have been gone for nearly three months now. And so that was, in fact, a restraint on her ongoing reporting that she cannot get back.

Signal also does not work with a contact list, and I don't believe that the government has that, even with what they were able to preserve with Signal, because she didn't have her sources saved in that way. So that is why, I believe, a prior restraint as we've argued.

And then just one further point, which is just to challenge Mr. Dibblee's assertion that applying the process used in *Baltimore Law Firm* case as Judge Porter has ordered would have drastic consequences for other criminal matters. I think that argument ignores the elephant in the room here, which is that this was an unprecedented search. We have not been able to find any other case in which a reporter's house was searched based solely on the reporter's news-gathering activities.

So we do appreciate the *Baltimore Law Firm* was an unusual case with unique circumstances, but this case has unusual circumstances as well, Your Honor. The government has taken an action that it has never taken before in history as far as we're aware.

And so there is good reason for the Court to affirm the very careful process that Magistrate Judge Porter laid out in his order. And so we would urge the Court to affirm it.

Thank you, Your Honor.

THE COURT: As I understand it, he's still working out that process.

MS. JEFFRESS: That's our understanding, yes, Your Honor.

THE COURT: All right. Counsel, I'll give you the last word on this.

MR. DIBBLEE: Ms. Jeffress is correct. We are going to go see him after we talk to you.

THE COURT: Right.

MR. DIBBLEE: Just a few points, Judge Trenga.

THE COURT: Yes.

MR. DIBBLEE: First off, Mr. Latcovich made the point that the government should not be allowed to rummage through the state in this professional

universe, I think was the phrase he used. Our filter protocol is clear, that the government will be winnowing down the material by a date range, which is in accordance with the warrant, and then we also will be making -- the government will be undertaking certain search terms to ensure that it is finding the relevant information that is responsive to that warrant.

So I have to resist this characterization that someone is just going to open these materials and start paging through them. That is not the process that we have laid out.

I also heard him to be saying that the government has admitted that not everything on these devices is relevant to the warrant and that somehow that is some kind of damning concession from us. But the truth is that whenever the government is engaged in a search process and grabs a trove of documents, there is a distinction between what the government may search and what it may seize.

This is in the Fourth Circuit's -- it's laid out in the *Veliz* case, which I know you're very familiar with that case, having worked on it at the district court level. But the Fourth Circuit there made the point that the government can search large troves of information provided that the warrant limits

the officer's discretion to seize only particular things, and here it's the exact same. The warrant allows the government to seize only evidence of the enumerated violations of Mr. Perez-Lugones.

I wanted to just talk very, very briefly about PPA, which came up in my presentation and Mr. Latcovich's presentation.

If you're looking at the PPA, 42 U.S.C. 2000aa, subsection (a), it says at the end -- so what it says, quote, it shall be unlawful for a government officer or employee to search for or seize any work product materials possessed by a particular person.

But then it says, "This provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if:

"(1) There is probable cause to believe that the person possessing such materials has committed or is committing a criminal offense."

So such materials refers to work product materials. And as I said when I was up here earlier, "work product materials" is a defined term, and that defined term does not include contraband or fruits of a crime.

The documentary materials provision, which is

subsection (b) of that same section, works the exact same way. The last line says this provision shall not impair the ability of the government to search for or seize such materials. So the "such materials" should be read in relation --

THE COURT: It seems to me that (b) covers exactly what you're saying. So (a) says it's unlawful to proceed to seize work product unless you have probable cause to believe the person committed the offense.

(b) says it's unlawful to seize document materials other than work product unless you have the same process, a probable cause process.

So the search materials you're saying would be under (b), right?

MR. DIBBLEE: Well, I am saying that both --

THE COURT: The evidence of crime materials would be under (b).

MR. DIBBLEE: No. If you were to look at -- this is 42 U.S.C. § 2000aa-7. There is a definition there in subsection (a) for documentary materials, and that definition, quote, does not include contraband or the fruits of a crime or things otherwise criminally possessed.

So it is incorrect to read the PPA as

permitting a search warrant only when a reporter -- there's probable cause to believe a reporter has engaged in wrongdoing. The statute clearly accepts --

THE COURT: And that definition is in 2000aa-7?

MR. DIBBLEE: 2000aa-7, Your Honor. I want to make sure I got that right. Yes, I did.

I do want to just -- maybe just make two final points here:

Regarding the *Miami* case, I do think there's a huge difference between the government requiring someone to say something and the government not doing so. Now, it makes sense that in the *Miami* case, there would have been a prior restraint where the government is requiring newspapers to give over their space to topics or subjects that the government directs them to do. That is a very clear imposition on speech. In fact, that compels speech.

That is not what's happening here. Ms. Natanson is not being compelled to do anything. She is able to report right now if she likes. There is no blockage or no foreclosing of her First Amendment expressive activity.

I wanted as well to just kind of make a point about the *Lo-Ji* case. We do think there's a direct

analog here in the sense that the town justice in that case was looking at materials and was determining at the time which materials the government had probable cause to seize. That's exactly what Judge Porter has ordered in this case. So we do think that that case is analogous.

THE COURT: What about the cases counsel referred to, the circuit court cases, where the privilege holder was directed to review materials, the *Rayburn* case and the others?

MR. DIBBLEE: So the *Rayburn* case is -- again, it involves facts that, I think, are just very, very different here in the sense that pretty much the entire trove of documents in that case that were directed to be reviewed by the congressman or covered by the speech or debate clause. So that is obviously a different privilege that we have here. As we've said, there is not some kind of widespread privilege that is -- that applies to all of these materials under the First Amendment.

As far as the other cases that Mr. Latcovich mentioned, those cases, I think, very clearly -- and this is in our papers. Those cases very clearly deal with instances where judicial officers are making privilege determinations, which is different from

what's been ordered here, which is where a judicial officer will be making a determination about what information is responsive to a warrant.

That is something that happened in the *Lo-Ji* case. I understand Mr. Latcovich's point about the facts there, but it is also true that that town justice engaged in exactly what the magistrate judge has ordered here.

THE COURT: All right.

MR. DIBBLEE: Thank you very much.

THE COURT: All right. Thank you. I appreciate the argument.

I'm going to take it under advisement. I will get a decision shortly.

Okay. Very good. Thank you.

Counsel is excused.

The Court will stand in recess.

----------------------------------

Time: 10:44 a.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/

Rhonda F. Montgomery, CCR, RPR